DAVID N. KINTZINGER and JAMES W. MILLIN, SR., executors of estate of LaVern G. Millin, deceased, and JAMES W. MILLIN, SR., individually, appellants, v. BERNICE P. MILLIN et al., WILLARD D. CALKINS, coexecutor of estate of LaVern G. Millin, appellees.

No. 50654.

(Reported in 117 N.W.2d 68)

SEPTEMBER 18, 1962.

Kintzinger & Kintzinger, of Dubuque, and Zastrow, Noah & Smith, of Charles City, for appellants.

O'Connor, Thomas, McDermott & Wright, of Dubuque, and William Chatterton, of Madison, Wisconsin, for appellees.

GARFIELD, C. J.—This is a probate proceeding involving the validity of testator's inter vivos gift of 3700 shares of corporate stock to his son, James W. Millin, one of three coexecutors under the will of LaVern G. Millin, deceased. Following trial to the court it was decreed the gift was invalid because the stock was not delivered to the donee. He, as an executor and individually, together with David W. Kintzinger, another executor, has appealed.

The issues arose upon an application of Kintzinger and James W. Millin, executors, and Millin, individually, for authority to sell preferred stock of Western Printing & Lithographing Company (herein called "Western" or "the company") in order to pay debts, taxes and costs of administration. The largest of these items is the federal estate tax. Bernice P. Millin, testator's divorced wife to whom the preferred stock was bequeathed, Chloe M. Calkins, daughter of Bernice and testator (she is also a sister of James W. Millin), and Willard D. Calkins, Chloe's husband, as the third coexecutor, filed objections to the application. They alleged the 3700 shares of Western common stock was rightfully part of testator's residuary estate and it was chargeable with the liabilities of the estate before resort could be had to the preferred stock bequeathed to Bernice.

By reply to the above objections, applicants-appellants alleged in part that testator did not own the 3700 shares of common stock when he died October 21, 1959, but had made a completed gift of it to his son James W. in January of that year.

Most of the evidence offered on the trial consisted of depositions of Western's officers in an attempt to establish there

were valid restrictions against ownership of the stock by non-employees. Testator was a retired employee of Western but his son James was never connected with it. The trial court, as indicated, placed his decision on the sole ground the gift to James failed for want of delivery of the stock and found it unnecessary to decide the validity of the claimed restrictions on its transfer.

I. On January 8, 1959, testator LaVern G. Millin and his son James went to a bank in Dubuque, where LaVern lived, and saw Mr. Joseph J. Peryon, vice-president. Testator had with him an envelope containing 17 certificates representing 3700 shares of Western common stock. He asked Peryon to witness his signature on the certificates and send them to Western at Racine, Wisconsin, so they might be transferred to his son. Testator signed the transfer form on each certificate, leaving blank the name of the transferee, and Peryon signed each of them as a guarantor of testator's signature. Testator asked the banker to transfer the certificates to James and instruct Western to mail them to his son.

Peryon wrote and signed a letter on the bank's letterhead to Western as testator directed. The latter read it and was given a copy. He was satisfied with the letter which, with the certificates, was mailed to Western at Racine the same day. The letter read, "We are enclosing herewith 3700 shares of stock issued in the names of L. G. Millin and LaVern G. Millin, who are one and the same person. Please reissue these shares in the name of James W. Millin and forward same to him at 1069 Lombard Avenue, St. Paul 5, Minnesota. We understand this transfer has already been discussed with you."

Mr. H. M. Benstead, a top officer of Western, wrote testator in Dubuque on January 12, acknowledging receipt of the bank's letter and the stock certificates, declining to transfer the stock and asserting that when testator was in Racine the preceding week it was understood testator intended to assign certain of his common stock to a trustee with the understanding Western's treasurer would vote the stock and it would be sold back to Western after testator's death—"When such a trust * * * is completed, we will be glad to transfer your stock, but to transfer

it pursuant to the letter from the bank is, first contrary to our agreement with you and, second, the request comes from a party not in interest. We would be disposed to return your certificates with this letter but inasmuch as they are endorsed and in negotiable form, we will hold them in safekeeping, awaiting your advice as to their disposition."

On January 17, 1959, Mr. Kintzinger, as attorney for testator and his son James, wrote Benstead. Essential parts of the letter are:

"Mr. Millin wants his said stock transferred to his son, James W. Millin sr., and enclosed herewith as your authority for completing said transfer is a separate Assignment of Stock, duly executed by Mr. Millin, which together with the assignments already signed by him, should give you ample legal authority to *complete the assignment immediately.* * * *

"Mr. Millin does not desire to establish a trust as proposed by you at the present time, nor does he or his son propose to work against the interests of you or the company in any way.

"If there is any legal reason why this transfer should not be completed promptly by you, please advise me the details of same. If there is some agreement, as you speak of in your letter, please let me know all of the details. Mr. Millin does not understand that he agreed to set up a trust as suggested by you, but his understanding is that he was merely discussing the matter with you and that he did not make any binding agreement supported by consideration.

"Please issue the new stock certificate promptly and send it to me as attorney for James W. Millin, Sr."

Enclosed with Kintzinger's letter to Benstead was an "Assignment of Stock," dated January 16, 1959, signed by LaVern G. Millin in Kintzinger's presence and with his signature guaranteed by the Dubuque bank previously referred to. Body of the assignment reads: "FOR VALUE RECEIVED, LaVern G. Millin, also known as L. G. Millin, does hereby sell, assign and transfer unto James W. Millin Sr., 1069 Lombard Ave., St. Paul 5, Minnesota thirty-seven hundred (3,700) shares of Common Stock of the Western Printing and Lithographing Co. (Racine, Wis-

consin) standing in my name on the books of said corporation represented by various Stock Certificates which have recently been forwarded to the corporation for transfer, and I do hereby irrevocably constitute and appoint ........................................................ attorney to transfer the said stock on the books of the within named Company with full power of substitution in the premises."

On January 29 Benstead wrote Kintzinger a letter, sending a copy to testator, his son and daughter. The letter is too long to reproduce here. It expresses surprise testator would attempt to transfer his stock to a nonemployee of the company without giving an employee the right to vote the stock and again urges creation of a trust "in a manner consistent with the wishes of the company as to the ultimate disposition of the stock."

Benstead testified in his deposition it was a condition of owning the stock that it would be offered back to the company if the employee became employed by a competing company and that upon the employee's death it would be offered back to Western in a manner suitable to the employee. There is no claim testator was ever employed by a competing company. There is other evidence the stock was to be offered back to Western if the owner merely left its employ before reaching retirement age. There was no restriction on transfer of the stock in the articles of incorporation or bylaws or on the stock certificates themselves prior to July 26, 1960, when the articles were amended to provide for different classes of stock and changing the corporate name to Western Publishing Co., Inc. There was no written agreement between the company and testator or other stockholder restricting transfer of the stock.

The week before testator and his son went to the Dubuque bank on January 8 they visited the company office in Racine. Benstead testified testator told him then he was not going to live long and had " 'enough stock here to take care of my wife and children and I would like to get the thing settled. I want to have Jim act for me in the matter.' " (After he and Bernice were divorced testator married Nancy Elizabeth who survived as his widow.) According to Benstead he told testator he might

accomplish his purpose by setting up trusts for his heirs that would carry out his wishes and not violate the conditions under which he owned the stock, Benstead showed him a trust agreement he had made regarding his own stock and testator said that was satisfactory to him as a means of accomplishing his purpose.

After testator's stock certificates were sent the company three quarterly dividends on it were declared and paid to testator before he died October 21, 1959.

On July 13, 1960, the three executors, the widow, the divorced wife, the son and daughter, who include all the heirs and beneficiaries under the will, signed a written consent that the 3700 shares be forthwith transferred absolutely and delivered to the son James "in accordance with the assignment of said shares made to [him] by LaVern G. Millin under date of January 16, 1959." James, in turn, assigned 1110 shares to his sister Chloe M. Calkins. The company then (July 1960) transferred 2590 shares to James and 1110 to Chloe.

The attitude of the company toward transfer of the stock to James prior to July 1960 was thus expressed by Mr. Benstead, "We object to James owning stock, not as an individual, but because he is not an employee."

II. We think the first question is the validity of the claimed restriction on transfer of the stock. This is solely a question of law. It is clear the stock would have been transferred on the company books and a new certificate issued to the son James except for this restriction on the transfer. It is unimportant just what the precise terms of the restriction were.

This question is to be determined by Wisconsin law. It is contended the restriction was orally agreed to by testator and other stockholders. The company is a Wisconsin corporation. Its place of business where the stock was issued and where testator worked was in that state. Testator lived there until his retirement. If, as contended, testator made an agreement restricting transfer of his stock it was made and to be performed in Wisconsin.

The law of the place of contracting determines the legality of the contract, especially where such place is also the

place of performance. Liljedahl v. Glassgow, 190 Iowa 827, 830, 831, 180 N.W. 870; McDaniel v. The Chicago & N. W. R. Co., 24 Iowa 412, 417; Restatement, Conflict of Laws, section 332(e); 11 Am. Jur., Conflict of Laws, sections 116, 117; 15 C. J. S., Conflict of Laws, section 11b, pages 883–886.

At the time this stock was issued to testator section 15 of the Uniform Stock Transfer Act was in effect in Wisconsin. So far as now pertinent it provides: "* * * there shall be no restriction upon the transfer of shares so represented [by certificate] by virtue of any by-laws of such corporation, *or otherwise,* unless the * * * restriction is stated upon the certificate." (Emphasis added.)

Further, the Wisconsin Supreme Court had held a corporate bylaw containing a less restrictive provision than the one now before us did not bind the purchaser of stock because it was not stated upon the stock certificate and he could compel the corporation to transfer the stock on its books. Magnetic Mfg. Co. v. Manegold (1930), 201 Wis. 154, 229 N.W. 544.

The case just cited was followed by Larson v. Superior Auto Parts (1955), 270 Wis. 613, 72 N.W.2d 316, 318, 319, where the restriction was agreed to by all stockholders. It was there contended the restriction was binding upon a stockholder who had actual notice of it even though not stated on the certificate and that the above statute did not apply to restrictions on transfers created by mutual agreement. Both contentions were rejected and the purported contract was held to be void.

█ Appellants' reply to appellees' objections refers to the Wisconsin statute and these two decisions by plain designation and the trial court's attention was called to them, as contemplated by rule 94, Rules of Civil Procedure. The Wisconsin statute and decisions leave no room for doubt that the claimed restriction upon the transfer of testator's 3700 shares was in violation of Wisconsin law and therefore void because not stated upon any of the certificates.

The Uniform Stock Transfer Act is in effect in Iowa (chapter 493A, Codes, 1950–1962; chapter 252, Laws of Fifty-second General Assembly, 1947) and all other states. Kansas and North

Dakota, however, omitted section 15 of the Act from their enactments. Hopwood v. Topsham Telephone Co., 120 Vt. 97, 132 A.2d 170, 173; Annotation, 29 A. L. R.2d 901. The Wisconsin precedents, supra, accord with several on the points there considered, notably Costello v. Farrell, 234 Minn. 453, 48 N.W.2d 557, 560, 563, 29 A. L. R.2d 890, 897-900, a leading case. See annotation, supra, at pages 901, 902; Hopwood v. Topsham Telephone Co., supra; Sorrick v. The Consolidated Telephone Co., 340 Mich. 463, 65 N.W.2d 713, 716.

Appellees admit Larson v. Superior Auto Parts and Costello v. Farrell, both supra, are contrary to their contention the claimed restriction on transfer was valid. They rely upon Baumohl v. Goldstein (1924), 95 N. J. Eq. 597, 604, 124 A. 118, 121, and Doss v. Yingling (1930), 95 Ind. App. 494, 172 N.E. 801. The Baumohl case makes the statement that section 15 of the Uniform Act "was designed for the protection of innocent purchasers of stock." No authority is cited for this. Doss v. Yingling repeats the statement on the authority of the Baumohl opinion. Neither decision is from the highest court of the state. Both antedate several decisions which reach a contrary result. In connection with Doss v. Yingling see Hoosier Chemical Works v. Brown, 200 Ind. 535, 165 N.E. 323, 325, which the former considers.

Baumohl v. Goldstein and Doss v. Yingling are discussed in Costello v. Farrell, supra, which Larson v. Superior Auto Parts, supra, approves. The annotation, supra, in 29 A. L. R.2d 901, 904, 905, explains the Baumohl and Doss cases on the basis of the peculiar facts in each which made it inequitable for the corporate officer to invoke section 15 of the Uniform Act. "It is doubtful that these cases would be followed except under similar conditions. It seems certain, at any rate, that it cannot be assumed from these cases that mere knowledge of the restriction will make it effective even though there is a lack of compliance with section 15 of the statute [page 904]."

There are at least three reasons why we decline to approve the statement in the Baumohl opinion, repeated in Doss v. Yingling, that section 15 of the Act was designed merely for the protection of innocent purchasers of stock: 1) The facts in those

cases differ widely from those here. 2) As Costello v. Farrell, supra, 234 Minn. 453, 461, 48 N.W.2d 557, 561, 29 A. L. R.2d 890, 898, observes, "If the authors of the uniform act and the legislature had intended that the benefit of the provision [section 15] * *· * should be limited to a purchaser for value in good faith without notice of the restrictive by-law, they undoubtedly would have said so. They simply said that there should be no restriction unless [it] was stated upon the certificate." 3) The Wisconsin court has declared the law of that state, with which we are concerned on this issue, to be contrary to the statement on which appellees rely.

It is unnecessary to decide appellants' claim that the restriction was void as against public policy.

III. We think the question whether there was a valid delivery of the 3700 shares is one of law. The facts bearing on the issue are not disputed nor susceptible of different inferences. No question of credibility of witnesses or weight of the evidence is presented. The only reasonable conclusion to be fairly drawn from this record is that there was sufficient delivery of the stock and the gift may not be invalidated on the ground of nondelivery. Tucker v. Tucker, 138 Iowa 344, 348, 116 N.W. 119; In re Estate of Hanson, 205 Iowa 766, 218 N.W. 308; In re Estate of Higgins, 207 Iowa 95, 97, 222 N.W. 401.

Division I hereof states the controlling facts. Testator signed the transfer form on each stock certificate in the presence of his son and the banker Peryon and gave them to the latter, directing him to send them to the company with instructions to reissue the stock in the son's name and forward it to James at his given address. The banker did as directed, to testator's satisfaction. As stated, it is clear the stock would have been reissued to the son except for a restriction on its transfer we have held void.

Upon being advised of the company's refusal to transfer the stock and its retention of the certificates, testator executed a separate document containing a written assignment and power of attorney in blank to transfer the stock on the company books. Upon receipt of this document and accompanying request for

issuance of a new certificate in the son's name, the company again refused the request because of the void restriction on transfer of the stock.

There is no substantial evidence casting doubt on testator's intention that James have this stock at the time testator parted with it. Such intent appears from writings that are not questioned. It may be conceded delivery is essential to a gift inter vivos. But delivery may be constructive or symbolic as well as actual. It was not necessary, under the circumstances here, that testator physically hand these stock certificates to his son who was present at the bank when the former gave them to the banker and retained no control over them.

We have held corporate stock may be transferred, as between the parties, by written assignment thereof without manual delivery of the stock certificates. Delivery of the separate instrument is deemed delivery of the stock. Especially should this be true where, as here, the owner has parted with possession of the certificates by having them sent to the corporation for transfer of the stock on its books.

See in support of these views Leedham v. Leedham, 218 Iowa 767, 769, 254 N.W. 61, 62, where the certificates themselves were not delivered to the donee-son nor to the attorney with whom the assignment was left. This holding is approved in Petty v. Mutual Benefit Life Ins. Co., 235 Iowa 455, 464, 15 N.W.2d 613, 615, and Home for Destitute Crippled Children v. Boomer, 308 Ill. App. 170, 31 N.E.2d 812, 820, 821. See also In re Estate of Fenton, 182 Iowa 346, 357, 165 N.W. 463, which supports the view that the written assignment here was a confirmation of the delivery already made of the stock. These precedents express the general rule. 24 Am. Jur., Gifts, section 81; 38 C. J. S., Gifts, section 22b, page 802; Annotations, 48 A. L. R.2d 1405, 1407, 1408; 23 A. L. R.2d 1171, 1190; 99 A. L. R. 1077, 1078, 1084; 63 A. L. R. 537, 545, 546.

According to our decisions and the weight of authority, transfer of the stock on the corporate books was not essential to a valid gift thereof as between the parties. Tucker v. Tucker, supra, 138 Iowa 344, 348, 116 N.W. 119; Smith v. Meeker,

153 Iowa 655, 658, 133 N.W. 1058; In re Estates of Antkowskis, 286 Ill. App. 184, 3 N.E.2d 132, 137; Bolles v. Toledo Trust Co., 132 Ohio St. 21, 4 N.E.2d 917, 920; 12A Fletcher Cyclopedia Corporations, Perm. Ed., section 5684; Annotation, 38 A. L. R. 1366; 24 Am. Jur., Gifts, section 78; 38 C. J. S., Gifts, section 46.

Appellees' assertion that Leedham v. Leedham, supra, has been overruled by Code section 493A.1 of our Uniform Stock Transfer Act cannot be accepted. They maintain the law of Iowa governs the validity of the transfer. Since appellants concede this, insofar as it involves the question of delivery, we assume it to be true, without so deciding.

Section 493A.1 provides: "How transferred. Title to a certificate and to the shares represented thereby can be transferred only, (1) by delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby, or (2) by delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign, or transfer the same or the shares represented thereby, signed by the person appearing by the certificate to be the owner of the shares represented thereby. Such assignment or power of attorney may be either in blank or to a specified person."

In the first place, certificates for 1620 of the 3700 shares were issued prior to February 21, 1947, and chapter 493A, including section 493A.1, does not apply to these certificates (section 493A.23).

In the second place, "delivery of the certificate", as used in 493A.1, quoted above, should not be held to mean merely delivery to the donee *personally*, as appellees seem to assume. The statute is not so limited in terms and we should not engraft such a limitation upon it. If there is delivery of the certificate indorsed in blank or accompanied by a separate document as referred to in (2) signed by the person appearing by the certificate to be the owner, the statute is complied with. " 'Delivery' means voluntary transfer of possession from one person to another." 493A.22. There was a delivery here within the terms of

493A.1. See in this connection 29 Chicago-Kent Law Review 342; Young v. Cockman, 182 Md. 246, 34 A.2d 428, 149 A. L. R. 1006, 1010. We will return to this point.

In the third place, although some decisions are to the contrary by what we think is the weight of authority which we are persuaded to follow, the rights of the parties as between themselves are not affected by the provisions of the Uniform Act. They were enacted for the protection of the corporation, so it might safely deal in payment of dividends or otherwise with the person in whose name the stock was registered. Hausfelder v. Security-First National Bank, 77 Cal. App.2d 478, 176 P.2d 84, 88; In re Estates of Antkowskis supra, 286 Ill. App. 184, 3 N.E.2d 132, 137; In re Estate of Hill, 30 Ill. App.2d 243, 174 N.E.2d 233, 235; State v. Schofield, 136 La. 702, 67 So. 557, 564; Bolles v. Toledo Trust Co., supra, 132 Ohio St. 21, 4 N.E.2d 917, 920; Gugle v. Gugle, 83 Ohio App. 85, 78 N.E.2d 585, 587; Re Connell, 282 Pa. 555, 128 A. 503, 38 A. L. R. 1362, 1365.

See also annotations, 23 A. L. R.2d 1171, 1194–1196; 48 A. L. R.2d 1405, 1416 ("In several of the later cases the courts have [held] * * * the provisions of the statute are for the protection of the corporation issuing the stock, and do not preclude a gift of the shares evidenced only by a separate written instrument which would be effective, as between the parties thereto, in the absence of the statute.")

We have said the Uniform Act, even if applicable, does not require delivery to the donee personally. Nor does the law, independent of the statute. "The rule is well settled that delivery to a third person as agent or trustee for the use of the donee, and under such circumstances as indicate that the donor relinquishes all control over the property and intends to vest title in the donee, is quite as effectual as manual delivery directly to him." Tucker v. Tucker, supra, 138 Iowa 344, 349, 116 N.W. 119; In re Estate of Fenton, supra, 182 Iowa 346, 353, 165 N.W. 463. For other precedents to like effect see In re Estate of Stockham, 193 Iowa 823, 828, 186 N.W. 650, 22 A. L. R. 765, 772, and citations; Annotation, 23 A. L. R.2d 1171, 1179,

1180. See also 24 Am. Jur., Gifts, section 30; 38 C. J. S., Gifts, section 25.

 Appellees argue the company was testator's agent for the purpose of delivery of the stock and cite a few precedents from other jurisdictions claimed to support this view. It is true generally that delivery to a donor's agent is not deemed absolute since he holds the property for the donor subject to recall. It is otherwise where delivery is to a third person as agent or trustee for the benefit of the donee. Annotations, 23 A. L. R.2d 1171, 1179–1183; 48 A. L. R.2d 1405, 1419–1421; 38 C. J. S., Gifts, section 25; 24 Am. Jur., Gifts, section 30.

 Our decisions make it clear that by causing the stock to be sent to the company for transfer on its records to James, testator did not intend to retain the title in himself nor cause the stock to be held subject to his right of recall. He is deemed rather to have constituted the company agent or trustee for the son's benefit. In no other way could the stock be transferred on the corporate records. In re Estate of Fenton, supra, 182 Iowa 346, 355, 356, 165 N.W. 463; In re Estate of Stockham, supra, 193 Iowa 823, 829, 186 N.W. 650, 22 A. L. R. 765, 772; In re Estate of Hanson, supra, 205 Iowa 766, 218 N.W. 308; In re Estate of Higgins, supra, 207 Iowa 95, 98, 222 N.W. 401; In re Will of Gorden, 238 Iowa 580, 582, 27 N.W.2d 900.

 We have said the person to whom delivery is made for the benefit of the donee is presumed, in the absence of counter-vailing circumstances, to take the property as trustee for the donee, not as agent of the donor. In re Estate of Hanson, supra (pages 769, 770 of 205 Iowa). To like effect are Devol v. Dye, 123 Ind. 321, 24 N.E. 246, 248, 7 L. R. A. 439; Varley v. Sims, 100 Minn. 331, 111 N.W. 269, 270, 8 L. R. A., N. S., 828, 117 Am. St. Rep. 694, 10 Ann. Cas. 473; Kennedy v. Nelson, 125 Neb. 185, 249 N.W. 546, 548.

 One other fact deserves further mention. As stated, after the stock was sent the company it declared and paid testator three quarterly dividends prior to his death. We think this insufficient on which to base a finding the stock was not delivered.

Testator's name stood on the corporate records as owner of the stock. Payment of dividends to him would therefore necessarily follow. Re Connell, supra, 282 Pa. 555, 128 A. 503, 38 A. L. R. 1362, 1364.

■ The gift having been completed when the assigned certificates and the separate assignment were sent the company, the son's title could not be affected by testator's receipt of the dividends. Indeed any act of a donor after a completed gift, not consented to or acquiesced in by the donee, will not affect the latter's title. Tucker v. Tucker, supra, 138 Iowa 344, 350, 116 N.W. 119; Jones v. Nicholas, 151 Iowa 362, 368, 130 N.W. 125; In re Estate of Fenton, supra, 182 Iowa 346, 354, 165 N.W. 463; Leedham v. Leedham, supra 218 Iowa 767, 771, 772, 254 N.W. 61; Shaw v. Addison, 239 Iowa 377, 386, 392, 28 N.W.2d 816, 821, 824. See also Re Connell, supra; State ex rel. Shaffer v. Kuthy, Ohio App., 71 N.E.2d 133, 135, 136.

An article in 20 Rocky Mountain Law Review 67, 68, entitled Application of the Uniform Stock Transfer Act to Gifts of Stock, states:

"If the donor's only purpose is to make an effective inter vivos gift of corporate stock, he should:

"1. Indorse the certificate and tender it to the issuing company for transfer with instructions to register the shares in the name of the donee and to mail a new certificate to the donee;

"2. Instruct the donee to exercise voting rights, receive dividends, and retain possession of the certificate."

Testator strictly complied with the first of these statements. Compliance with the second is not shown. Testator had no occasion to comply therewith because of the company's refusal to reissue the stock.

This from Strout v. Burgess, 144 Maine 263, 278, 68 A.2d 241, 251, 12 A. L. R.2d 939, 952, directly supports our holding on the issue of delivery: "It is evident that Charles T. Burgess made sufficient delivery of these endorsed certificates of stock to transfer title. Both the transferee and the transferor were present at the bank with these stock certificates endorsed in blank. The stock certificates in the presence of both parties were

delivered to the cashier of the bank to forward for transfer on the books of the various corporations by whom they had been issued, in accordance with directions given to him. This constitutes sufficient delivery by the transferor to the transferee. Had the transfer been of the entire interest no one could question the sufficiency of the delivery to pass title from the transferor to the transferee."

IV. One other question is presented. Appellees contend if there was a valid gift of the 3700 shares of common stock it should bear a proportionate share of the federal estate tax. In computing such tax the value of this stock is included although the gift was valid. Indeed the greater part of the tax was assessed because the common stock is included in the estate for purposes of computing such tax. In no other sense was this stock part of the estate.

Without regard to the common stock the principal asset testator left was preferred stock in the same company. The probate inventory gives the value of this preferred stock at $41,500, or about one third the value of the common stock. Appellees contend this difference in values is much too low. Total value of estate assets, other than all the corporate stock, is given as $3155.

The will directs testator's debts and funeral expenses be first paid out of the estate, bequeaths the preferred stock to his divorced wife Bernice, and "the rest, residue and remainder" of the estate in three equal parts to his wife Nancy, son James and daughter Chloe. The will then appoints the three coexecutors.

The application of two of the executors for authority to sell the preferred stock in order to pay debts, taxes and costs of administration lists the total of these items at $40,819, of which $23,093 is the balance of the federal estate tax. It is apparent that without apportionment of this federal tax against the common stock or its owners the bequest to the divorced wife Bernice will be largely reduced by payment of such tax from the so-called probate assets. She will bear most of the burden of the tax and the donee of the common stock will be wholly relieved therefrom.

In 1942 the supreme court made it clear that the question of who must bear the ultimate burden of the federal estate tax, with two exceptions not here involved, is determined by state statute or judicial decision. Riggs v. Del Drago, 317 U. S. 95, 97, 63 S. Ct. 109, 110, 87 L. Ed. 106, 110, 142 A. L. R. 1131, 1132, 1133; Annotation, 16 A. L. R.2d 1282; 47 C. J. S., Internal Revenue, section 776. (The federal statute, Title 26, U. S. C. A., section 826(c) and (d), provides the beneficiary of life insurance and the recipient of property over which decedent held a power of appointment must bear their pro rata share of the total estate tax.) We have no such statute and no Iowa decision is applicable to the situation here. The will is also silent on the question who must pay the tax.

Estate of Brown v. Hoge, 198 Iowa 373, 377, 199 N.W. 320, holds the federal estate tax was not a charge against the several legacies, and should be deducted before computing the state inheritance tax. The opinion states: "Ordinarily, the tax imposed by the above quoted statute would be paid out of the residue of an estate, if there was a residue sufficient out of which to make such payment; and if there was no residue, or an insufficient residue, it would be paid out of other property belonging to the estate, whereby there would be contribution to the fund used in payment of the tax from the several legacies proportionately."

The Brown decision does not consider the question we have here of apportionment of the federal estate tax between probate and nonprobate assets. Brown left no assets of the latter kind. We do not doubt the propriety of the general rule that in the absence of a provision of the will to the contrary the burden of estate taxes falls upon the residuary estate, not upon individual bequests. But where, as here, congress has included in the taxable estate not only the probate assets but also an inter vivos gift which testator did not own when he died we think it is more just and equitable, in the absence of a contrary direction in the will, to require the donee of the gift to reimburse the executor to the extent of the estate tax generated by it.

Before the supreme court's contrary holding in Riggs v. Del Drago, supra, some state courts construed the federal estate

tax statute as indicating congressional intent that the burden of the tax should be borne by the probate estate because the executor was required to pay it and that apportionment of the tax should be allowed only in the two instances specified in the federal statute. Carpenter v. Carpenter, 364 Mo. 782, 267 S.W.2d 632, 641; Myers v. Sinkler, 235 S. C. 162, 110 S.E.2d 241, 244, and citations.

Since the Riggs decision, supra, a few courts have adhered to their former rulings against apportionment of the tax, others have approved apportionment, and many states have enacted apportionment statutes. Most of the state courts that have considered, for the first time since the Riggs case was decided, the question of apportionment of the federal tax between probate and nonprobate assets have upheld the right thereto where the will does not provide otherwise. Annotations, 37 A. L. R.2d 169, 171.

Most of the precedents just referred to are based on the right of equitable contribution in favor of one who discharges more than his share of a common burden. See United States v. Goodson, 8th Cir., Minn., 253 F.2d 900, 906. We have frequently recognized such right. Lovrien v. Fitzgerald, 245 Iowa 1325, 1330–1332, 66 N.W.2d 458, 462, and citations. It is true the executors are required to pay the federal estate tax and the government looks to them for payment. However, section 6324 of the Internal Revenue Code, 26 U. S. C. A., makes any transferee of property included in the taxable estate personally liable for the tax to the extent of the value of the property received and the tax is a lien against the whole of such estate. It is thus the joint and several obligation of the donee of the inter vivos gift as well as of the executors. Bragdon v. Worthley, 155 Maine 284, 153 A.2d 627, 633; Carpenter v. Carpenter, supra, 364 Mo. 782, 267 S.W.2d 632, 642; Myers v. Sinkler, supra, 235 S. C. 162, 110 S.E.2d 241, 246.

That the executors may be required to pay the tax initially does not determine ultimate liability therefor as between the two parts of the taxable estate, nor negative their right to reimbursement for the part of the tax attributable to the nonprobate assets included therein. Carpenter v. Carpenter,

supra (at pages 638, 642 of 267 S.W.2d) ; McDougall v. Central National Bank, 157 Ohio St. 45, 104 N.E.2d 441, 445; Myers v. Sinkler, supra.

The gist of appellants' argument on this issue is that a majority of courts deny the right of apportionment in the absence of a statute or testamentary direction providing therefor and if apportionment is to be allowed it should be done by the legislature, not the courts. We do not agree a majority of courts, especially those which have recently passed on the right of apportionment as between probate and nonprobate assets, deny such right. A more accurate statement is that "there is a clean split in the authorities on" the question. 28 Am. Jur. (1959), Inheritance, Estate and Gift Taxes, section 481, page 348. In any event there is ample authority to support enforcement of such right. Nor are we persuaded that judicial application of fundamental equitable principles of long standing must await legislative sanction.

These are some of the precedents that support our decision on this question: Pearcy v. Citizens Bank & Trust Co., 121 Ind. App. 136, 96 N.E.2d 918, 98 N.E.2d 231; Bragdon v. Worthley, supra, 155 Maine 284, 153 A.2d 627; Carpenter v. Carpenter, supra, 364 Mo. 782, 267 S.W.2d 632; Re Gallagher, 57 N. M. 112, 255 P.2d 317, 37 A. L. R.2d 149; McDougall v. Central National Bank, supra, 157 Ohio St. 45, 104 N.E.2d 441; In re Mellon's Estate, 347 Pa. 520, 32 A.2d 749, 757; Industrial Trust Co. v. Budlong, 77 R. I. 428, 76 A.2d 600, 604, 605; Myers v. Sinkler, supra, 235 S. C. 162, 110 S.E.2d 241. There are also one or more decisions to like effect in Delaware, Florida, Georgia and Kentucky.

This question is discussed in 28 Am. Jur. (1959), Inheritance, Estate and Gift Taxes, sections 481, 483; Annotations, 37 A. L. R.2d 169, 183, 185; 15 A. L. R.2d 1216, 1220 et seq.

We approve this from McDougall v. Central National Bank, supra, 157 Ohio St. 45, 51, 104 N.E.2d 441, 444: "In the instant case, the taxable estate of decedent for estate tax purposes was divided into two separate parts, the probate estate and the trust estate. The federal estate tax fell on both of those parts. Because of the existence of the nonprobate assets in the trust

estate, the federal estate tax was substantially increased beyond what it would have been if the trust assets had not been included in the decedent's gross estate for the purpose of determining the amount of the estate tax. Under those circumstances and where there are no state statutes indicating and the decedent has indicated no intention as to who or what shall bear the burden of that tax, it is difficult to understand the justice of a rule of law that would impose the whole burden of the estate tax on one of the two separate parts of this decedent's estate * * *."

We conclude the holders of the common stock should pay such portion of the federal estate tax as the value of such stock, for estate tax purposes, bears to the sum of the net estate, for such purposes, and the exemption allowed in computing that net estate, determined under section 935(c), Title 26, U. S. C. A., McDougall case, supra.

Two thirds the court costs shall be paid by the executors out of estate funds. The remaining third shall be paid: two thirds by James W. Millin, Sr. and one third by Chloe M. Calkins.

For further proceedings not inconsistent with this opinion the cause is—Reversed and remanded.

All JUSTICES concur.