**TRIBUNE PUBLISHING CO. and News Review Publishing Co., Inc., Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 83–7218.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 1983.

Decided April 26, 1984.

Thomas D. Cockran, Witherspoon, Kelly, Davenport & Toole, Spokane, Wash., for petitioners-appellants.

Thomas Preston, Washington, D.C., for respondent-appellee.

Before WRIGHT, ANDERSON and FLETCHER, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

This is an appeal of a decision by the United States Tax Court, 79 T.C. 1029, affirming a determination by the Commissioner of Internal Revenue (Commissioner) that the appellants were deficient in their federal income taxes for the years 1976, 1977, and 1978.

## I. BACKGROUND

Appellants Tribune Publishing Co. (Tribune) and News Review Publishing Co., Inc. (News) are two Idaho corporations which operate daily newspapers out of Lewiston, Idaho, and Moscow, Idaho, respectively. Both appellants filed federal corporate income tax returns for the years in question. Tribune publishes a morning newspaper in Lewiston, named the Lewiston Tribune. News publishes an afternoon newspaper in Moscow, about 30 miles away, named the Daily Idahonian. Both papers serve the

same general area and there are a significant number of readers who subscribe to both.

During the years in issue, Tribune was owned primarily by the members of the Alford family, several of whom served as corporate officers. Prior to 1967, News was owned and operated by the Marineau family. William Marineau (William) was the president and publisher and A.J. Marineau (A.J.) was the vice-president and general manager.

The Alfords and Marineaus enjoyed cordial relations with one another. There was a long-established relationship of friendly competition between the two papers.

In 1967, the shareholders of News received an offer for their stock from a large national newspaper chain. All of the shareholders except the two Marineaus wished to accept the offer. William became concerned about the prospect of the control of the paper leaving the community. He contacted the Alford family at the offices of the Tribune, and expressed his concern. He pointed out that it would be to Tribune's disadvantage for a chain newspaper to be located only 30 miles away from Lewiston. William proposed that the Tribune might buy the stock of News that was up for sale to the national chain. The Alford family shared William's concern and agreed to purchase some of the shares. The remaining shares were purchased by E. Russell Short and Reta S. Tate. Following the sale, the outstanding News stock was owned as follows:

| Stockholder | Number of Shares |
| --- | --- |
| Tribune Publishing Co. | 100 |
| A.J. Marineau | 50 |
| William T. Marineau | 25 |
| E. Russell Short and Reta S. Tate | 75 |
| Total | 250 |

The day after the sale of stock, the shareholders of News entered into an agreement (the 1967 Agreement). A.L. Alford, Jr. and Charles Alford were also parties to the agreement even though they had not, as individuals, purchased any stock in News. The agreement provided that certain conditions were required to be met before a shareholder could sell his shares. Under the agreement, Tribune and the two Alfords were granted "the sole and exclusive first option to meet any bona fide offer of sale" to be received by any of the remaining shareholders for their stock. This is commonly known as a "right of first refusal," whereby one party has the first right to another's stock if he can match the offer made by a third party. If Tribune desired to sell its stock in News, the agreement similarly gave the remaining shareholders the right to "meet the terms" of the proposed sale. The terms of the agreement were never printed on the stock certificates themselves. Neither was the agreement ever incorporated into the Articles of Incorporation or the corporate bylaws.

In 1972, Russell Short and Reta S. Tate decided to sell their interest in News. William contacted A.L. Alford, Jr. and informed him of the proposed sale, and Tribune bought the shares. However, Tribune did not formally invoke its right of first refusal when it acquired the Short/Tate shares. Following the purchase of the Short/Tate shares, the stock of News was owned as follows:

| Stockholder | Number of Shares |
| --- | --- |
| Tribune Publishing Co. | 175 |
| A.J. Marineau | 50 |
| William T. Marineau | 25 |
| Total | 250 |

Tribune now owned 70% of the outstanding stock of News. However, the Alfords did not attempt to control the day-to-day operations of that company.

In 1976, the two Marineaus decided to transfer some of their stock to other members of their family. A.J. contacted A.L. Alford, Jr. to make sure that Tribune and the Alfords would agree to the proposed transfers within the Marineau family. Neither Tribune nor the Alfords had any desire to purchase the Marineau stock and the Marineaus were informed that they were free to dispose of it as they desired. Subsequently, at the meeting of the board of directors of News, it was resolved to allow the Marineaus to convey their stock

in News to any member of their family, and that those members would, thereafter, hold the stock free of any restrictions. Then, in 1979, the Marineaus decided to offer their stock to Tribune and the Alfords under the terms of the 1967 agreement. However, they declined to purchase the stock and it was ultimately sold to an outside party.

During the years in question, every corporation was allowed one surtax exemption when filing yearly federal income tax returns, pursuant to section 11(d) of the Internal Revenue Code. 26 U.S.C. § 11(d) (1976), *amended by* 26 U.S.C. § 11 (Supp. II 1978) (imposing graduated surtax) (amended 1981). However, sections 1561–1563 of the Code placed a limitation on surtax exemptions when corporations were part of a "controlled group." 26 U.S.C. § 1561 (1976) (amended 1978 to limit benefits of graduated surtax; amended 1981, 1982); 26 U.S.C. § 1563 (1976). One type of controlled group of corporations is a "parent-subsidiary controlled group," which is defined in section 1563(a)(1) as:

> One or more chains of corporations connected through stock ownership with a common parent corporation if
>
> (A) stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of each of the corporations, except the common parent corporation, is owned ... by one or more of the other corporations; and
>
> (B) the common parent corporation owns ... stock possessing at least 80 per cent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of at least one of the other corporations, excluding, in computing such voting power or value, stock owned directly by such other corporations.

In determining whether the stock ownership tests of section 1563(a)(1) are satisfied, some of the outstanding stock of the subsidiary corporations in the group is disregarded in certain circumstances. Section 1563(c), in pertinent part, provides as follows:

> (1) General Rule.—For purposes of this part, the term "stock" does not include—
>
> ⁘  *  *  *  *  *
>
> (C) stock which is treated as "excluded stock" under paragraph (2).
>
> (2) Stock Treated as Excluded Stock.—
>
> (A) Parent-subsidiary controlled group.—
>
> For purposes of subsection (a)(1), if a corporation ... owns ... 50 percent or more of the total combined voting power of all classes of stock entitled to vote or 50 percent or more of the total value of shares of all classes of stock in another corporation, ... the following stock of the subsidiary corporation shall be treated as excluded stock
>
> *  *  *  *  *  *
>
> (iii) stock in the subsidiary corporation owned ... by an employee of the subsidiary corporation if such stock is subject to conditions which run in favor of such parent ... corporation and which substantially restrict or limit the employee's right ... to dispose of such stock.

During 1976 through 1978, Tribune owned more than 50 percent of News' outstanding stock, satisfying the ownership requirement of section 1563(c)(2)(A). Because of the 1967 Agreement, the Commissioner determined that the Marineau stock was "excluded stock" within the meaning of section 1563(c)(2)(A)(iii) and, therefore, Tribune and News were a "controlled group" under the Code since Tribune owned more than 80 percent of News with the Marineau stock excluded from the calculation. Therefore, they were entitled to only one surtax exemption between them. Since they each took an exemption for the years in question, the Commissioner determined Tribune deficient in the amount of $18,392.00 and News deficient in the amount of $40,608.00 on their federal income taxes. The Tax Court entered a decision in accordance with this determination.

## II. ANALYSIS

The appellants' first contention is that section 1563 was designed for circumstances other than those existing here. They cite the legislative history of section 1563 which states: "[T]he Internal Revenue Code contains several provisions designed to prevent taxpayers from using the multiple form of corporate organization, to avoid taxes." H.R.Rep. No. 749, 88th Cong. 1st Sess., *reprinted in* 1964 U.S.Code Cong. & Ad.News, 1313, 1425. But, "there are legitimate business reasons for the use of separate corporations and, therefore, the separate corporations should generally be recognized as separate taxpayers, retaining the benefit of the use of multiple surtax exemptions." *Id.* at 1426. Appellants argue that since News was already an existing business with outstanding stock when it was acquired by Tribune, there were no tax avoidance motives involved. Therefore, the legislative history of Section 1563 mandates that they be allowed multiple exemptions.

■ However, the legislative history of 1563 also states: "An example of a condition which substantially restricts or limits an employee's right to dispose of his stock within the meaning of subparagraph (A)(iii) [of section 1563(c)(2) ] is a condition whereby the parent corporation is given a right of first refusal if such stock is offered for sale." *Id.* at 1630. The current tax regulations implement this example used in the House Report. Treas.Reg. § 1.1563–2(b)(2)(iii) (1983). This seems to imply that a more objective test is to be used in determining when to apply section 1563. In fact, this is what the United States Supreme Court determined recently, in *U.S. v. Vogel Fertilizer Co.*, 455 U.S. 16, 27–28, 102 S.Ct. 821, 828–29, 70 L.Ed.2d 792 (1982). There, the court stated:

> Until 1964, the method prescribed by the Code to curb the abuse of multiple incorporation was subjective: Multiple exemptions or benefits were allowed or disallowed depending on the reasons for the taxpayer's actions. The Revenue Act of 1964 changed this approach, adding §§ 1561–1563 to the Code .... These sections prescribed the application of mechanical, objective tests for determining whether two corporations were a "controlled group" and thereby restricted to one surtax exemption.

Thus, Congress has changed its approach in determining the existence of "controlled groups" from subjective (i.e., tax avoidance motives) to "mechanical, objective tests." This supports the finding of the Tax Court, in this case, when it followed an earlier Tax Court decision, *Barton Naphtha Co. v. Commissioner*, 56 T.C. 107, 116 (1971).

Appellants further argue that since the 1967 Agreement was reciprocal (i.e. the Tribune was bound to the same conditions as were the Marineaus), it did not constitute a "substantial restriction" on the Marineau's right to freely dispose of their stock. Appellants cite section 1563(c)(2)(B)(ii) of the Code which defines "excluded stock" for purposes of determining whether a corporation is a member of a "brother-sister controlled group of corporations." It states that if a restriction on the stock of an employee also applies to the common owner, then it shall not be excluded.

Appellants' reliance on this section is misplaced. This section applies only to brother-sister controlled groups. The same exemption is not included under parent-subsidiary controlled groups, and this court will not rewrite the statute to include it.

In furtherance of their argument that the Marineau stock was not substantially restricted, appellants point to the resolution passed by the Board of Directors of News on April 26, 1976, which purportedly amended the 1967 Agreement to allow the Marineaus to convey their stock to family members who would, thereafter, hold it free of any restrictions.

■ We do not think that the Board of Directors of News had the authority to amend the 1967 Agreement since News was not even a party to that agreement. The Agreement was between Tribune and News' other shareholders. Tribune did not

participate in the board's resolution. The resolution could not modify the original shareholders agreement.

Finally, appellants argue that the right of first refusal on the Marineau's stock was not a substantial restriction because it was not legally enforceable. Their argument is based largely on a repealed Idaho statute. Former Idaho Code § 30–415 provides:

> There shall be no lien in favor of a corporation upon the shares represented by certificates issued by such corporation and there shall be no restriction upon the transfer of shares so represented by virtue of any bylaws of such corporation, or otherwise, unless the right of the corporation to such lien or the restriction is stated upon the certificate.

Uniform Stock Transfer Act, ch. 88, § 15, 1927 Idaho Sess.Laws 107 (repealed 1967). This statute was part of the Uniform Stock Transfer Act (USTA) which was repealed, effective Dec. 31, 1967, after the 1967 Agreement was entered into. However, in adopting the Uniform Commercial Code, which replaced the USTA, the legislature addressed the problem of the effect of the Code on transactions entered into before its effective date, as in the present case. This is Idaho Code § 28–10–102(2), which states:

> Transactions validly entered into before the effective date [Dec. 31, 1967] and the rights, duties and interests flowing therefrom remain valid thereafter and may be terminated, completed, consummated or enforced as required or permitted by any statute or other law amended or repealed by this Act as though such repeal or amendment had not occurred.

Assuming the original Code section 30–415 still applies to this case, it is not dispositive. We are not faced here with the typical situation of a third party contesting the validity of a restriction on stock that is acquired from another. Rather, the 1967 Agreement was in the nature of a contract. The parties, possessing unrestricted stock, entered into a binding agreement to restrict that stock. Tribune and News are now simply denying the validity of that agreement for tax purposes.

Both Tribune and the Marineaus have acted according to the agreement up to the present. In 1976, the Marineaus found it necessary to attempt to modify the agreement, and in 1979 they abided by the terms of the agreement when they formally notified Tribune of their desire to sell their stock in News.

Appellants cite several cases interpreting Section 15 of the USTA which support the proposition that a stock restriction is unenforceable unless stated upon the certificates, including an Idaho case, *Hulse v. Consolidated Quick Silver Mining Corp.*, 65 Idaho 768, 154 P.2d 149 (1944). That case, as the Commissioner and the Tax Court noted, does not involve an agreement similar to the one here.

■ The Idaho court has never reached the issue of whether an agreement, not in conformity with the former Idaho Code Sec. 30–415, would be valid as a contract between the parties. Although state courts disagree on this issue, we are persuaded that Idaho would follow the weight of common law authority and hold that the contract is valid between the parties, especially when the parties have acted in accordance with the agreement. *See, e.g., Palmer v. Chamberlin*, 191 F.2d 532, 534 (5th Cir.1951) (applying Louisiana law); *Barton Naphtha v. Commissioner*, 56 T.C. 107, 119 (1971) (applying Iowa law); *Vannucci v. Pedrini*, 217 Cal. 138, 143, 17 P.2d 706 (1932); *Doss v. Yingling*, 95 Ind.App. 494, 172 N.E. 801, 803 (1930); *Searles v. Bar Harbor Banking Co.*, 128 Me. 34, 145 A. 391, 393 (1929); *Baumohl v. Goldstein*, 95 N.J.Eq. 597, 124 A. 118, 120 (1924); *Blue Mountain Forest Assn. v. Borrowe*, 71 N.H. 69, 51 A. 670, 673 (1901). *See also* Note, *Restriction Upon Transfer of Stock While Not Valid By-Law, Is Nevertheless Binding Upon the Parties as a Contract*, 38 Va.L.Rev. 103 (1952). *But see Goodar Investment Co. v. Detroit Bank & Trust Co.*, 4 Mich.App. 218, 144 N.W.2d 649, 651 (1966) (transfer restrictions invalid despite knowledge of restriction by parties); *Kint-*

*zinger v. Millin*, 254 Iowa 173, 117 N.W.2d 68 (1962) (interpreting Wisconsin law and refusing to follow *Doss v. Yingling* and *Baumohl v. Goldstein* ); *Costello v. Farrell*, 234 Minn. 453, 48 N.W.2d 557 (1951) (restriction not on certificate, therefore invalid despite parties' knowledge). *See generally* Cataldo, *Stock Transfer Restrictions and the Closed Corporations*, 27 Va.L.Rev. (1951); Annot., 29 A.L.R.2d 901 (1951).

We believe the rationale of *Baumohl v. Goldstein*, 95 N.J.Eq. 597, 124 A. 118, is sound:

> [Section 15 of the Uniform Stock Transfer Act] was designed for the protection of innocent purchasers of stock in the open market or otherwise and not at all as a shield by one with knowledge of a condition to unconscionably protect himself from the consequences thereof.

124 A. at 121. Idaho's subsequent repeal of section 15 further supports our conclusion that Idaho courts would follow this rationale and enforce the agreement between the parties.

## III. CONCLUSION

We conclude that there were substantial restrictions on the Marineau stock and, as between the parties to the 1967 Agreement, these restrictions are enforceable. Therefore, section 1563 clearly mandates that the Marineau stock must be excluded from total stock outstanding in determining whether there is a parent-subsidiary controlled group within the meaning of the statute.

The judgment of the tax court is

AFFIRMED.