582 P.2d 215

L. Katharine OGILVIE,
Plaintiff-Respondent,

v.

IDAHO BANK & TRUST CO.,
Defendant-Appellant.

No. 12191.

Supreme Court of Idaho.

July 31, 1978.

362

William A. Parsons, of Parsons & Smith, Burley, Dennis P. Harwick, Pocatello, for defendant-appellant.

Craig Marcus, of Marcus & Marcus, Boise, for plaintiff-respondent.

## ON REHEARING

McFADDEN, Justice.

The previous opinion in this case is withdrawn and this opinion is hereby substituted.

This appeal arises from an action to recover stock certificates pledged to defendant-appellant Idaho Bank and Trust Company (hereinafter IB&T). The district court granted summary judgment in favor of plaintiff-respondent L. Katharine Ogilvie (hereinafter respondent Ogilvie), holding that the pledge of the stock certificates was invalid and that IB&T acquired no rights by the pledge. The judgment is affirmed.

Stock certificates representing 629 shares of common stock of Idaho First National Bank were originally purchased by respondent Ogilvie. At her request, the certificates were reissued to respondent Ogilvie and her son, Richard R. Ogilvie, as follows:

1. Two hundred eighty-eight shares were issued between May 5, 1956, and January 21, 1965, in the following language: "L. KATHARINE OGILVIE & RICHARD R. OGILVIE, JT. TEN."

2. Three hundred forty-one shares were issued between March 4, 1968, and January 18, 1973, in the following language: "L. Katharine Ogilvie & Richard R. Ogilvie. As joint tenants with right of survivorship and not as tenants in common."

Respondent Ogilvie states in her deposition, which was introduced in the proceeding below, that she placed both names on these certificates, "because I thought I just might die someday and I wanted them to go to him." She states further that while the dividends were paid to her, additional issues of stock, either by way of stock splits or stock dividends, were issued in both names. She kept the stock certificates in a metal file box in her home until she became ill and, following hospitalization, was moved to a Boise nursing home. Her sister then took possession of her belongings, including the stock certificates. Richard Ogilvie thereafter somehow acquired possession of the shares from his aunt, but without respondent Ogilvie's knowledge or consent.

On November 20, 1974, Richard Ogilvie pledged these stock certificates to IB&T as collateral for a $14,795.50 personal loan. Idaho Bank and Trust did not register this transfer with Idaho First National Bank nor did it receive new, reissued or re-registered stock certificates from Idaho First National Bank.

In conjunction with the loan, IB&T required the signatures of both Richard Ogilvie and respondent Ogilvie on the stock power indorsing the stock certificates. The signatures of respondent Ogilvie appearing on these documents were forged.

The loan became due on February 18, 1975, and has since been delinquent. Richard Ogilvie died on March 1, 1975. Idaho Bank and Trust then commenced foreclosure proceedings on the certificates. Respondent Ogilvie, in response, initiated the present action to recover the stock certificates from IB&T. The district court granted summary judgment for respondent Ogilvie, holding that there was no evidence of a valid intervivos gift of the stock certificates to Richard Ogilvie. The district court held that since Richard Ogilvie acquired no interest in the certificates that might be encumbered by a pledge of the certificates, IB&T acquired no interest in the certificates. This appeal is from that judgment.

The issue on appeal is whether, by obtaining a pledge of the certificates from Richard Ogilvie, IB&T acquired any interest in these stock certificates, and if so, to what extent.

Notwithstanding Idaho statutory and common law principles concerning gifts and the creation of joint tenancies, transfers of investment securities are governed by the Idaho Uniform Commercial Code—Investment Securities (hereinafter Article 8). I.C. §§ 28–1–105(2), –8–102(1)(b). However, where Article 8 is silent as to the applicable law, our disposition is governed by principles of law and equity supplementing the provisions of the Uniform Commercial Code. I.C. § 28–1–103.

## I

## UNIFORM COMMERCIAL CODE—INVESTMENT SECURITIES

The stock certificates involved in this case are "securities" as that term is defined by Article 8. "A 'security' is an instrument which is . . . in . . . registered form; and is of a type commonly dealt in upon security exchanges . . . [and] . . . is issued or dealt in as a medium for investment; and is . . . divisible into a class or series of instruments; and evidences a share, participation or other interest in property or . . . evidences an obligation of the issuer." I.C. § 28–8–102(1)(a).

Under Article 8, IB&T, by virtue of Richard Ogilvie's pledge of the stock certificates, is a purchaser of securities. A "purchaser" is defined by I.C. § 28–1–201(33) as "a person who takes by purchase." Under I.C. § 28–1–201(32), " 'purchase' includes taking by . . . pledge, . . . gift or any other voluntary transaction creating an interest in property." The facts are uncontroverted that Richard Ogilvie voluntarily pledged the stock certificates to IB&T, thereby conferring purchaser status upon IB&T.

Under these facts, IB&T also enjoys the preferred status of a "bona fide purchaser." See I.C. § 28–8–301(2). Idaho Code § 28–8–302 provides: "A 'bona fide purchaser' is a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security . . . in registered form . . . indorsed to him . . . ." As has been indicated, IB&T is a "purchaser" under I.C. § 28–1–201(32), (33). "Value" includes the act of extending credit. I.C. § 28–1–201(44)(a). Under Article 8, "good faith" and "without notice" mean that the person extending credit acts honestly in conducting the transaction and has neither actual knowledge, nor, from all the facts and circumstances, should have known that an adverse claimant asserts rights in the pledged collateral. I.C. § 28–1–201(19), (25). In the instant case, there is no evidence that anyone other than Richard Ogilvie or respondent Ogilvie claim any interest in the securities. Although IB&T could have protected itself from a forgery, I.C. § 28–8–312, there is no evidence suggesting that IB&T knew or should have known that respondent Ogilvie claimed rights to the pledged collateral because her signature was forged. Therefore, by extending credit IB&T became a bona fide purchaser of the pledged securities after receiving delivery of the shares pursuant to the pledge agreement.

## (A)

## RESPONDENT OGILVIE'S FORGED INDORSEMENT

Once the logical connection between different definitional sections of the Idaho

Uniform Commercial Code is made and such definitional matters understood, I.C. §§ 28-8-301 to -8-320 provide a relatively simple method for resolving claims between competing claimants in investment securities.

As a general rule, a bona fide purchaser, upon receiving delivery of an investment security, prevails against all adverse claimants. I.C. § 28-8-301(2). A bona fide purchaser is, therefore, a favored sub-class of purchasers prevailing over all claimants, including the true owner of the security. I.C. § 28-8-301(1).

To this broad statement is added the exception contained in I.C. § 28-8-311(a), providing that in cases of forged indorsements, a bona fide purchaser prevails against the true owner only if he has received new, reissued or re-registered securities from the issuer.[1] Under I.C. § 28-8-311(a), the true owner of an investment security, with certain exceptions not herein applicable, may assert the ineffectiveness of an "unauthorized indorsement" appearing on pledged securities against a bona fide purchaser, unless the bona fide purchaser has received new, reissued or re-registered securities from the issuer. The "unauthorized indorsement" referred to in I.C. § 28-8-311 "means one made without actual, implied or apparent authority and includes a forgery." I.C. § 28-1-201(43). Thus when reconciling the broad protection extended a bona fide purchaser in I.C. § 28-8-301(2) with the protection afforded the true owner of the securities in I.C. § 28-8-311(a), as between the owner and a bona fide purchaser relying on a forged indorsement of pledged securities, priority is given the owner, unless the bona fide purchaser also received reissued stock certificates from the issuer prior to receiving notice of the owner's adverse claim. See Folk, *Article 8: Investment Securities,* 44 N.C.L.Rev. 654 (1966); Folk, *Some Problems Under Article 8 of the*

*Uniform Commercial Code,* 5 Ariz.L.Rev. 193 (1964); Guttman, *Article 8—Investment Securities,* 17 Rutgers L.Rev. 136 (1962).

This priority extended to the true owner of forged stock certificates includes the right to reclaim possession of the securities from a bona fide purchaser:

> If the transfer is wrongful because of an unauthorized endorsement, the owner may also reclaim or obtain possession of the security or new security even from a bona fide purchaser if the ineffectiveness of the purported indorsement can be asserted against him under the provisions of this chapter on unauthorized indorsements [section 28-8-311].

I.C. § 28-8-315(2).

The record is uncontradicted that Richard Ogilvie forged respondent Ogilvie's indorsement to the promissory note, pledge instrument, loan purpose statement and stock power in pledging the securities to IB&T as collateral for his loan. Since IB&T did not receive new, reissued or re-registered securities from Idaho First National Bank, it cannot assert rights in the securities against respondent Ogilvie by virtue of the forged indorsement.

### (B)

### RICHARD OGILVIE'S INDORSEMENT

Richard Ogilvie's own indorsement of the promissory note, pledge instrument, loan purpose statement and stock power, however, was not forged. The issue remains whether IB&T acquired an interest and if so, to what extent, in the securities by virtue of Richard Ogilvie's delivery, indorsement and pledge of the stock certificates.

While the record is uncontroverted that respondent Ogilvie initially did not give Richard Ogilvie possession of the stock cer-

---

1. *28-8-311. Effect of unauthorized indorsement.*—Unless the owner has ratified an unauthorized indorsement or is otherwise precluded from asserting its effectiveness

(a) he may assert its ineffectiveness against the issuer or any purchaser other than a pur-

chaser for value and without notice of adverse claims who has in good faith received a new, reissued or re-registered security on registration of transfer; . . . . .

tificates, it is also uncontroverted that she, as the sole owner of the stock certificates, later indorsed and delivered them to Idaho First National Bank and requested that it reissue the certificates to herself and Richard Ogilvie as joint tenants. This presents the issue of whether respondent Ogilvie's voluntary parting with control, indorsement and delivery of the stock certificates to Idaho First National Bank with instructions to list Richard Ogilvie as a joint tenant give Richard Ogilvie an enforceable interest in the securities under Article 8.

It is important to note that two transfers of investment securities are involved in this case: the first concerns a transfer from respondent Ogilvie to Richard Ogilvie when the stock certificates were indorsed and delivered to Idaho First National Bank with directions to reissue the certificates to Richard Ogilvie as a joint owner; the second involves a transfer from Richard Ogilvie to IB&T. No question is raised concerning the second transfer from Richard Ogilvie to IB&T and, therefore, whatever interest Richard Ogilvie obtained or possessed was transferred to IB&T. The court's inquiry, thus, focuses on the first transfer from respondent Ogilvie to Richard Ogilvie via Idaho First National Bank to determine what rights, if any, he obtained from respondent Ogilvie that he could thereafter pledge to IB&T.

■ A "purchaser" is one who takes by purchase, I.C. § 28–1–201(33); "purchase" includes taking by issue or reissue. I.C. § 28–1–201(32). Thus, Richard Ogilvie became a purchaser of the stock certificates when Idaho First National Bank reissued the certificates to respondent Ogilvie and Richard Ogilvie as joint tenants.

Under I.C. § 28–8–309, a transfer of an investment security to a purchaser requires both an indorsement and a delivery of the security: "An indorsement of a security * * * does not constitute a transfer until delivery of the security on which it appears or if the indorsement is on a separate document until delivery of both the document and the security." This "delivery" requirement is explained as being a volun-

tary parting with control of the securities, I.C. § 28–1–201(14), and occurs when the purchaser or someone on his behalf acquires actual possession of the indorsed security. I.C. § 28–8–313(1)(a).

■ While the requirement of physical delivery contained in Article 8 may serve a valid evidentiary purpose in the case of a sole owner, where, as here, there is more than one listed owner, the requirement that the new owners personally receive physical possession of the stock certificates to constitute a valid transfer is not applicable because both joint tenants cannot enjoy possession simultaneously. *Robison v. Fickle,* 340 N.E.2d 824 (Ind.Ct.App. 1976). This result is especially appealing because possession by one co-owner is deemed possession by all. *Washington County Irrigation Dist. v. Talboy,* 55 Idaho 382, 43 P.2d 943 (1935); *Kinney v. Ewing,* 83 N.M. 365, 492 P.2d 636 (N.M. 1972); *Frey v. Wubbena,* 26 Ill.2d 62, 185 N.E.2d 850 (1962); *In re Estate of Paulson,* 219 N.W.2d 132 (N.D. 1974). Moreover, since possession alone, without the other co-owner's indorsement will not result in a valid transfer of the entire interest, I.C. §§ 28–8–308(3)(e), –8–309, no purpose is served by requiring physical delivery to Richard Ogilvie to constitute a transfer of an investment security. *See Frey v. Wubbena,* 26 Ill.2d 62, 185 N.E.2d 850 (1962); *Robison v. Fickle,* 340 N.E.2d 824 (Ind.Ct.App. 1976); *Kintzinger v. Millin,* 254 Iowa 173, 117 N.W.2d 68 (1962); *Marans v. Newland,* 141 Mont. 32, 374 P.2d 721 (1962); *In re Estate of Paulson,* 219 N.W.2d 132 (N.D. 1974); *Buresh v. First Nat'l Bank of Oregon,* 262 Or. 104, 496 P.2d 913 (1972); *Manning v. United States Nat'l Bank of Portland,* 174 Or. 118, 148 P.2d 255 (1944); *Henderson v. Tagg,* 68 Wash.2d 188, 412 P.2d 112 (1966). Unquestionably, respondent Ogilvie could not have transferred full ownership in the shares to a third party during Richard Ogilvie's lifetime without obtaining his indorsement of the jointly owned stock certificates. I.C. § 28–8–308(3)(e). This court therefore holds that respondent Ogilvie's voluntary parting with control, delivery and indorsement of the

stock certificates to Idaho First National Bank satisfied the delivery and indorsement requirements of I.C. § 28–8–309 and gave Richard Ogilvie some interest in the stock certificates. This interest could thereafter be conveyed to a bona fide purchaser accepting a pledge of the securities. Our holding is in conformity with the dictates of Article 8 extending foremost protection to a bona fide purchaser of investment securities. I.C. § 28–8–301(2).

Under I.C. § 28–8–301(3), Richard Ogilvie's interest was limited to that of a joint tenant of stock certificates: "A purchaser of a limited interest acquires rights only to the extent of the interest purchased." Joint ownership with right of survivorship is a recognized form of ownership of investment securities under Article 8. I.C. § 28–8–308(3)(e). Similarly, a pledge of stock certificates is a recognized method of perfecting a security interest. I.C. § 28–9–302; I.C. § 28–9–305. However, the attributes of ownership held by a joint tenant in investment securities is not addressed by the Uniform Commercial Code, except as provided by I.C. § 28–1–103: "Unless displaced by the particular provisions of this act, the principles of law and equity * * * shall supplement its provisions."[2] Therefore, to this extent, the court's disposition is controlled by applicable common law principles governing joint tenancies.

## II

### JOINT TENANCY

Initially, it is important to note the limited scope of the court's inquiry of common law principles applicable to jointly owned stock certificates. A valid transfer of investment securities into joint ownership occurs when the "indorsement" and "delivery" requirements of I.C. § 28–8–309 are satisfied. See Part I(B) supra. The issue thus viewed, the court need not decide whether a valid gift inter-vivos was effected and whether a valid joint tenancy was created. This was satisfied when the stock certificates were indorsed and delivered to the issuer with instructions to list the purchaser as a joint tenant. I.C. § 28–8–309. The court's inquiry is instead directed toward the competing rights of respondent Ogilvie and a third party, IB&T, who claims possessory rights by virtue of Richard Ogilvie's pledge of jointly owned stock certificates.

Idaho continues to recognize joint tenancies between two persons as a valid and enforceable means of concurrent ownership of property, whether real, personal, tangible or intangible. I.C. § 55–104. A distinguishing incident of joint tenancy is the right of survivorship, whereby the death of one joint tenant terminates the joint tenancy and vests complete title in the surviving joint tenant. 4 G. Thompson, Real Property § 1779 (1961). A joint tenancy, however, may be terminated prior to the death of one of the joint tenants by any act of the joint tenants which destroys one or more of the essential common law unities of interest, title, time and possession, 2 American Law of Property § 6.2 (A. Casner ed. 1952); W. Burby, Real Property § 94 (3d ed. 1965); 4 G. Thompson Real Property § 1779 (1961); 48 C.J.S. Joint Tenancy § 4 (1947). Because of the right of survivorship, debts secured by jointly owned property by a debtor joint tenant are not enforceable against the joint tenancy property after the death of the debtor joint tenant, unless one or more of the essential unities was destroyed prior to the joint tenancy's termination by death, and then only to the extent of the debtor joint tenant's interest. W. Burby, Real Property § 94 (3d ed. 1965); 4 G. Thompson, Real Property § 1780 (1961); 20 Am.Jur.2d Cotenancy and Joint Ownership § 108 (1965).

The remaining issue, therefore, is whether the joint tenancy in the stock certificates was severed prior to its termination on Richard Ogilvie's death. If it was severed, Richard Ogilvie and respondent

---

2. The competing rights of a pledgee and non-participating joint tenant of stock certificates pledged by a debtor joint tenant are also not addressed by the Idaho Uniform Commercial Code—Secured Transactions, except as provided by I.C. § 28–1–103.

Ogilvie acquired equal one-half interests in the stock certificates as tenants in common and IB&T could foreclose on Richard Ogilvie's one-half interest. However, if no severance occurred, IB&T would have no enforceable interest in the stock certificates because title to the jointly owned property vested solely in respondent Ogilvie at the instant of Richard Ogilvie's death because of the right of survivorship.

A pledge is a security device whereby possession of personal property is transferred to the creditor as security for the debt. *Isaak v. Journey*, 52 Idaho 392, 15 P.2d 1069 (1932). The pledgee obtains merely a possessory lien against the property pledged. *MacDonald v. Pacific Nat'l Bank of San Francisco*, 66 Cal.App.2d 357, 152 P.2d 360 (1944); *First State Bank of Audubon, Iowa v. Collins-Dietz-Morris Co.*, 190 Okl. 409, 123 P.2d 957 (1941); *Howick v. Bank of Salt Lake*, 28 Utah 2d 64, 498 P.2d 352 (1972). In this state, liens do not transfer title to the property that is pledged. I.C. § 45–109. The common law unity of title was not, therefore, destroyed by Richard Ogilvie's pledge of the stock certificates. *See People v. Nogarr*, 164 Cal.App.2d 591, 330 P.2d 858 (1958) (mortgage by one joint tenant of jointly owned realty does not destroy unity of title in a state following lien-theory of mortgages); *D.A.D., Inc. v. Moring*, 218 So.2d 451 (Fla.App. 1969) (action to foreclose mortgage on realty executed by one joint tenant is not enforceable after death of debtor joint tenant); *Hyland v. Standiford*, 253 Iowa 294, 111 N.W.2d 260 (1961) (pledge of stock certificates as security for a loan does not sever the joint tenancy).

IB&T argues that Richard Ogilvie's pledge of the stock certificates destroyed the common law unity of possession and resulted in a severance of the joint tenancy because a pledge, by definition, requires that the pledgee receive physical possession of the collateral. This argument is unpersuasive. The unity of possession essential to the existence of a joint tenancy means that each joint tenant is entitled to the use and enjoyment of the whole property, as if a sole owner, subject to the other joint tenants' equal and undivided rights of pos-

session. 4A R. Powell, Real Property §§ 603, 617 (1977), 4 G. Thompson, Real Property § 1777 (1961). Appellant's argument ignores the fact that joint tenants may contractually transfer possession of joint tenancy property without effecting a severance of the joint tenancy. A lease, or other similar conveyance transferring possession of joint tenancy property to a third party, executed by all the joint tenants does not sever a joint tenancy, nor will severance result when less than all joint tenants execute a lease of joint tenancy property. *See generally* Annot., 49 A.L.R.2d 797 (1956). In most jurisdictions, a lease given by less than all the joint tenants allows the lessee to occupy and possess the joint tenancy property, subject to the non-participating joint tenants' rights of possession. Annot., 49 A.L.R.2d 797 (1956). Similarly, a joint pledge of stock certificates to secure a joint liability of the joint tenants does not result in a severance of a joint tenancy in stock certificates, despite the pledgee's possession of the stock certificates. *Hyland v. Standiford*, 253 Iowa 294, 111 N.W.2d 260 (1961). In *Swartzbaugh v. Sampson*, 11 Cal.App.2d 451, 54 P.2d 73 (1936), the court said:

> It has also been held that one joint tenant in possession of personal property may pledge his interest in the property to another; that the pledgee's rights are valid to the extent of the pledgor's interest; that each joint tenant has an equal right of possession and so the pledgee has the same right of possession that the pledgor had * * *.

*Id.* 54 P.2d at 77 (citing with approval *Frans v. Young*, 24 Iowa 375 (1868)). The court therefore holds that the common law unity of possession was not destroyed when IB&T obtained physical possession of the jointly owned stock certificates.

Therefore, no severance of the jointly owned stock certificates occurred before Richard Ogilvie's death. IB&T took as security the interest of but one of two joint tenants. This interest extinguished when Richard Ogilvie failed to survive respondent Ogilvie. IB&T thus has no interest in the

**368**

stock certificates that is now enforceable against respondent Ogilvie.

The judgment of the district court is affirmed with instructions to enter appropriate orders transferring possession of the stock certificates to respondent Ogilvie as the surviving joint tenant. Costs to respondent Ogilvie.

DONALDSON, J., concurs.

SHEPARD, C. J., concurs in the result.

BAKES, Justice, concurring in part and dissenting in part:

Although I agree with the majority's analysis under the UCC in Part I of its opinion, I must dissent from its resolution of the severance issue addressed in Part II. Whether Idaho Bank & Trust's security interest in the stock evaporated upon Richard's demise should not turn upon the anachronistic question of whether one of the four unities (interest, title, time, and possession) was destroyed when Richard pledged the stock. Rather, we should base our decision upon the clear policy favoring free alienability and liquidity of assets and the accepted utility of the joint tenancy with right of survivorship as a means of disposing of property upon death.

The four unities are one method, albeit crude and mechanistic, of reconciling the societal interest in free alienability of assets with the nature of joint tenancies. When two individuals hold property in joint tenancy with right of survivorship, the probable descent of the property depends upon which of the two is likely to live longer. If a transfer by one joint tenant to a younger third person left the joint tenancy intact—but with the life of the grantee substituted for that of the grantor—the odds that the other joint tenant would eventually obtain full title to the property could be substantially altered to his detriment. This vulnerability could be averted by prohibiting a single joint tenant from transferring his interest without the consent of the other joint tenant or tenants, as Justice Bistline's special concurring opinion suggests, but such a rule would offend the policy against restraints on alienation. However, the potential for abuse can also be avoided without restraining alienation by converting the joint tenancy with right of survivorship into a tenancy in common at the time of a transfer. The rule that a joint tenancy is severed when one of the four unities is destroyed accomplishes this desirable result.

However, severing a joint tenancy whenever one of the four unities is destroyed may be undesirable in many cases. When one joint tenant leases his possessory rights to a third person, the unity of possession is obviously and palpably destroyed, yet the relative risks concerning survivorship are not affected because the same lives continue to govern the ultimate disposition of the property. Similarly, a mortgage or pledge undermines the unity of interest without threatening the integrity of the survivorship arrangements. To avoid an unnecessary conversion of a joint tenancy with right of survivorship into a mere tenancy in common, courts facing such problems have managed to reach counter-intuitive results in their analyses of the unities issues, as the cases cited in the majority opinion demonstrate.

The pledging problem involved in the case before us shows how the policy of protecting the expectations of joint tenants without restraining alienation is disserved by tying the severance issue to the question of whether one of the four unities has been destroyed. If one holds that pledging stock destroys one of the unities (such as the unity of possession, which it clearly does), thereby completely and permanently severing the joint tenancy, then the survivorship device is gone. It is destroyed even though the pledging, in and of itself, does not reduce the likelihood that the non-pledging joint tenant will obtain full title by surviving the pledging joint tenant. The non-pledging joint tenant's chance of being the survivor would not be affected unless and until the pledging joint tenant defaulted and the pledgee foreclosed on the security interest, at which point the non-pledging joint tenant would have to outlive the pledgee in order to obtain full title. How-

ever, if the pledging joint tenant successfully discharged his obligation to the pledgee, the stock would be unencumbered again, and the odds of survivorship would have remained unchanged throughout. Thus, if a complete severance occurred at the time of the pledge, the survivorship device would have been destroyed for no good reason.

On the other hand, one may hold, as the majority does, that pledging does not destroy any of the unities and, therefore, that no severance results. However, this approach effectively impairs the alienability and liquidity of the jointly held assets; the potential pledgee's security interest becomes so ephemeral that few, if any, lenders would knowingly extend credit on the strength of it. In order to use the asset to enhance his borrowing power, the joint tenant would have to create a severance by means of a straw transaction with a third party (or through judicial partition). This is not only wasted motion, but also places the joint tenant on the horns of a dilemma: if he chooses to augment his borrowing power by severing the joint tenancy so that a lender will accept a security interest in the stock, he cannot retain the survivorship device; he cannot have both under a traditional four unities analysis.

In my view, there is a simple and direct solution to this problem. Disregarding the ill-fitted straightjacket of the four unities, I would hold merely that a pledge results in a floating, partial severance of the joint tenancy. Specifically, the survivorship provision should be suspended to the extent necessary to protect the pledgee's security interest, but should otherwise remain intact. Thus, if a joint tenant pledged his interest in the jointly held asset and thereafter predeceased the remaining joint tenant, the pledgee could enforce his security interest in the pledgor's interest in the asset to the extent of his claim against the pledging joint tenant; after the pledgee's claim was satisfied, any excess of the pledging joint tenant's interest would pass under the survivorship provision to the surviving joint tenant. Such a rule promotes free alienability and liquidity of assets, with minimal disruption to the survivorship means of disposing of property.

The approach that I have suggested is not unprecedented. In *Wilken v. Young,* 144 Ind. 1, 41 N.E. 68 (1895), the court concluded that "a joint tenant may mortgage his interest in the joint estate . . ., and *to the extent of the mortgage lien* the right of the survivor will be destroyed or *suspended,* and the equity of redemption, at the death of the [mortgagor] tenant, will be all that will fall to the surviving companion." *Id.* 41 N.E. at 70 (emphasis added). Referring to the *Wilken* decision, one commentator has observed, "[T]he joint tenancy is not severed but surviving joint tenants take subject to the mortgage executed by one joint tenant." 4 G. Thompson, Commentaries on the Modern Law of Real Property § 1780 (Supp.1977). According to another commentator, a similar rule is applied when one joint tenant leases his interest in property and thereafter expires before the lease does. *See* W. Burby, Handbook of the Law of Real Property § 94, at 221 (3d ed. 1965). Such a rule would be in keeping with Article IX of the Uniform Commercial Code, which has expanded and liberalized the rules governing security interests in personal property in order to facilitate the collateralization of loans to borrowers, thus enhancing commerce and business.

BISTLINE, Justice, concurring in part, dissenting in part.

The majority opinion concludes that Katharine Ogilvie, in her capacity as a joint owner of stock which was transferred by means of a forgery, may recover that stock from the purchaser, Idaho Bank and Trust. Such is the correct result and I concur therein. *In route* to this result, however, the majority tacitly approves of what should be recognized to be the bank's questionable business practice in this transaction, overlooks the controlling portions of the U.C.C., and bases its holding on a quirk of the common law which would not have availed Katharine except for the unfortunate death of her son. Because these portions of the majority opinion undermine sound commercial expectations and uniform legal results, I respectfully dissent.

### 1. *The Status of the Bank.*

The majority concludes that, under the facts of this case, Idaho Bank & Trust "enjoys the preferred status of a 'bona fide purchaser.'" Nothing is made to hinge on this dictum since the rights of Katharine, as the victim of the forgery, would be identical regardless of whether the bank was merely a "purchaser," or enjoyed the preferred status of a "bona fide purchaser." Still, the dictum could have unfortunate results in other contexts and deserves comment.

In order to be a "bona fide purchaser," one must, among other things, have taken delivery of the security "in good faith and without notice of any adverse claim." I.C. § 28–8–302. As the majority correctly notes, the controlling Code sections interpret these requirements to

> mean that the person extending credit acts honestly in conducting the transaction and has neither actual knowledge, nor, from all the facts and circumstances, should have known that an adverse claimant asserts rights in the pledged collateral.

I.C. § 28–1–201(19), (25). Having stated the standard correctly, the majority then applies it to the facts of this case as follows: "*Although IB&T could have protected itself from a forgery,* I.C. § 28–8–312, there is no evidence suggesting that IB&T knew or should have known that respondent [Katharine] Ogilvie claimed rights to the pledged collateral because her signature was forged." (Emphasis added.) The majority application, it seems to me, misallocates the burden of proof on such a question and settles for too low a standard of commercial behavior. Precisely because the bank *could* have protected itself from a forgery, yet did not take the care to do so, I would hold that it cannot assert the rights of a "bona fide purchaser." A pledge of a stock certificate which, on its face, states that it is owned by two persons as joint tenants, is notice to the pledgee that he is dealing with property in which another person who is not the pledgor has an "adverse claim." The Code defines an "adverse claim" as any claim that a transfer was or would be wrongful *or* that a particular adverse person is the owner or has an interest in the security. (Emphasis added.) I.C. § 28–8–301(1). It will be a rare case in which a bank or stock broker will receive any greater notice than was present here that a potential forgery is afoot. Under the facts of this case, I would hold that IB&T *was* put on notice, had a duty to inquire, and that its failure to do so constituted lack of "good faith," regardless of the subjective good intentions of the bank officials.

Sound commercial practice would dictate that the bank have both joint tenants sign the pledge in the presence of a bank official. Where this is not possible, a stock power may be used. Again, sound commercial practice would require that it, too, be signed in the presence of a bank official or other reliable witness. When dealing with nearly $30,000 worth of securities, the Bank should be in some contact with the co-owner. That there was no insuperable obstacle to the Bank making contact with Katharine is evidenced by the fact that it had no trouble notifying her of the pending foreclosure in this suit. The Federal Reserve Board definition of "good faith" requires as much. The Board's Regulation U governs stock-secured extensions of credit by a bank and

> requires that the customer's statement on this form be accepted by an officer of the bank acting in good faith. Good faith requires that such officer (1) must be alert to the circumstances surrounding the credit, and (2) if he has any information which would cause a prudent man not to accept the statement without inquiry, has investigated and is satisfied that the statement is truthful.

The bank manager who signed the document in this case made the following declaration:

> I have supplied the information required of the bank and accept the customer's statement on this form in good faith as defined below.* [The asterisk leads one to the Regulation U definition.] I am

familiar with the provisions of Regulation U.

The conduct of the Bank can not be said to have measured up to this *objective* criteria of "good faith." No Bank official ever personally witnessed Katharine's signing on any documents involved in this transaction. The signatures on two of the documents— the note itself and the stock power—are forged in what appear to be two totally different hands. And the space on the stock power for witnesses ("Signed, sealed and delivered in the presence of") was left *blank.*

A failure to make inquiry under circumstances which are sufficient to put a prudent businessman on notice is sufficient to establish "bad faith." The notions of "good faith" and "notice" tend to merge and one's status as a "bona fide purchaser" can be lost just as easily by negligence as by subjective dishonesty. *Hollywood National Bank v. International Business Machine Corp.,* 14 U.C.C.Rptr. 782, 38 Cal.App.3d 607, 113 Cal.Rptr. 494 (1974). The burden of proving one's status as a bona fide purchaser rests today, as it did in pre-Code law, on the holder of the security. This is so because the holder is the party who can most easily discharge the burden. It is he alone who had the means to verify the signatures, he alone who had access to the facts of the transaction. *Krick v. First National Bank of Blue Island,* 11 U.C.C. Rptr. 834, 8 Ill.App.3d 663, 290 N.E.2d 661 (1972); *Young v. Kaye,* 9 U.C.C.Rptr. 713, 443 Pa. 335, 279 A.2d 759 (1971). Under the facts of this case, I would hold that the Bank did not shoulder the burden of proving its status as a "bona fide purchaser."

2. *Richard's Right to Transfer the Securities.*

The majority opinion recognizes the fact that Katharine, as the true owner of forged stock certificates, has the right to reclaim possession of the securities even from a bona fide purchaser. I.C. § 28–8–315(2). This, according to the majority, does not end the inquiry. Because *Richard's* signature was *not* forged, there is said to remain the issue of whether IB&T acquired an interest and if so, to what extent, in the securities by virtue of Richard Ogilvie's delivery, indorsement and pledge of the stock certificates.

The majority holds, that Richard acquired a joint tenant's interest at the time Katharine had the stock issued to herself and Richard as joint tenants, and that Richard's half interest could thereafter be validly pledged by forging his cotenant's signature. The majority proceeds immediately from this crucial holding to an analysis of the common law to determine whether Richard's pledge of the stock to IB&T served to sever his joint tenancy. According to the majority, if a pledge of stock does *not* sever the joint tenancy, then Katharine can reclaim possession of the entire value of the stock by virtue of her right of survivorship. If a pledge *does* sever the joint tenancy, then the stock will be returned to Katharine subject to the Bank's claim on Richard's interest therein.

The majority's common law analysis is sound but it need not have been undertaken. One need not reach *the common law question* of the quantum of interest transferred by a joint tenant's pledge of forged securities if one first resolves *the logically prior Code question* of the validity of a joint tenant's transfer of forged securities.

The majority's sole consideration of the question of whether or not Richard could validly transfer his interest by forging his cotenant's signature is handled with the observation that when Katharine had the stock issued to herself and Richard as joint tenants, she thereby

> gave Richard Ogilvie some interest in the stock certificates. This interest could thereafter be conveyed to a bona fide purchaser accepting a pledge of the securities.

No analysis of the Code is provided nor is any authority cited in defense of this holding. The holding is all the more remarkable in light of the majority's statement, only one sentence earlier,

Unquestionably, respondent [Katharine] Ogilvie could not have transferred the shares to a third party during Richard Ogilvie's lifetime without obtaining his indorsement of the jointly owned stock certificates. I.C. § 28–8–308(3)(c).[1] The principle announced in this latter passage is correct and must bind. Richard as well as Katharine.

In order to transfer any interest at all in securities, one must be authorized to indorse the securities in question. The governing statute is I.C. § 28–8–308, which reads:

(1) An indorsement of a security in registered form is made when *an appropriate person* signs on it or on a separate document an assignment or transfer of the security or a power to assign or transfer it or when the signature of such person is written without more upon the back of the security. (Emphasis added.)

Thus the question of Richard's ability to indorse the securities and transfer his half interest therein, hinges upon the question of whether *one* joint tenant can ever be "an appropriate person" to make such an indorsement. The Code's guidance on this point is somewhat indirect:

(3) "An appropriate person" in subsection (1) means

(a) the person specified by the security or by special indorsement to be entitled to the security; or

. . . . .

(e) where the security or indorsement so specifies more than one person as tenants by the entirety or with right of survivorship and by reason of death all cannot sign,—the survivor or survivors

. . . . .

The general rule, therefore, is that where the security specifies more than one person as joint tenants with a right of survivorship, the language requiring "an appropriate person" to indorse the security must be construed so as to require *all* the specified cotenants to sign. Subsection (e) creates a

narrow exception to this general rule: if, "by reason of death all cannot sign," then in this limited situation, "the survivor or survivors" may do so.

Such a reading of I.C. § 28–8–308(3) is in line with the construction placed upon that section by the foremost authority on the Investment Securities chapter of the U.C.C.:

Section 5.08 *Appropriate Person; Aggregates.*

Aggregates include

(a) joint tenants, tenants by the entireties or tenants in common;

. . . . .

Where the form of registration specifies more than one person as joint tenants or tenants by the entireties (with or without reference to rights of survivorship) or as tenants in common, the presumption is that all must sign.

Israels & Guttman, Modern Securities Transfers, § 5.08 at 75–76 (1971). In short, those who are most familiar with the brokerage business know that a single signature is totally ineffective to transfer stock held in joint name. The Massachusetts Supreme Judicial Court lamented the naivete of a plaintiff who thought otherwise:

[T]he son did not understand the legal effect of the joint ownership of stock and intended that his mother during her lifetime should have the right to dispose of the stock any time she wished. He did not then know that his mother could not use the stock without his signature.

*White v. White,* 346 Mass. 76, 78, 190 N.E.2d 102, 103 (1963). Richard was not so naive. That is why he had to forge his mother's signature. It will come as a shock to the investment community to discover, as the majority apparently holds today, that because Richard was listed on the certificates as joint tenant, he was authorized under Article 8 of the U.C.C. to transfer or pledge *his* interest therein by foregoing his cotenant's indorsement.

---

1. The section quoted from the Code deals with the right of one or more fiduciaries to transfer stock without the signature of a party who had been named as a co-fiduciary but is no longer serving in that capacity. It is not clear how it serves as authority for the majority's holding.

Such a conclusion, it seems to me, is untenable. For one thing, it creates a lack of symmetry in the law between Richard who *can* transfer to a third party on the strength of his own signature and the forged signature of his co-tenant, and Katharine who, by the majority's own admission, had no such power. Moreover, the result hinges upon the happenstance of Richard's death. The majority holds that Richard *was* authorized to pledge his interest but that the Bank runs the risk of being cut off by Katharine's right of survivorship in the event Richard dies. Making the result hinge upon such a fortuitous occurrence runs counter to the very nature of negotiable securities and wreaks havoc with the Code's system of guarantees whereby the victim of a forgery is *always* entitled to be made whole—either by the purchaser (even a bona fide purchaser) if the self-same security is still in his possession, I.C. § 28–8–315, or by the issuer if a bona fide purchaser has received a new security upon registration of transfer, I.C. § 28–8–311. Finally, the rationale adopted upon by the majority introduces a note of uncertainty into the important position occupied by joint tenancies in estate planning and other contexts. For these reasons, I dissent.