THOMPSON, Presiding Judge.
 

 J.L. Butler, Sr. (“Butler”), and J.L. Butler, Jr. (“Jamie”) (collectively, “the Butlers”), appeal from two summary judgments entered in favor of MaxiStorage, Inc. (“MaxiStorage”), Dewey Brazelton, and Brazelton Properties, Inc. (“BP”). In the judgments, entered at separate times as to separate claims,
 
 [1]
 
 the trial court found that BP was the owner of MaxiStorage and that MaxiStorage was the owner of certain property on Jordan Lane in Huntsville (“the property”), ejected the Butlers from the property, awarded MaxiStorage $72,500 for the Butlers’ wrongful detention of the property, denied the Butlers’ counterclaim of intentional interference with contractual or business relations, and dismissed all the remaining claims of the parties. The Butlers timely appealed to the Alabama Supreme Court, which transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975.
 

 The evidentiary submissions of the parties in support of their respective motions for a summary judgment and their oppositions thereto tend to show the following. Union Planters Bank (“the bank”) held a promissory note for approximately $250,000 and a mortgage on a parcel of
 
 *1223
 
 property on Jordan Lane in Huntsville.
 
 [2]
 
 The property was environmentally contaminated with oil and gas, and the bank, which did not want to foreclose on the property itself because of the contamination, was willing to sell its interest in the property for less than the amount of indebtedness represented by the promissory note. Jamie and William J. Gibbons, Jr., an attorney for the bank, discussed the possibility of the Butlers’ purchasing the bank’s interest in the property, i.e., the mortgage. In 2000, Jamie contacted Bra-zelton to determine if Brazelton would lend money to the Butlers to enable them to purchase the bank’s interest in the property. No loan was made at that time.
 

 In 2003, the bank still held the promissory note and mortgage on the property. In October 2003, Gibbons and Brazelton had a conversation during which Gibbons asked Brazelton whether he would be interested in purchasing the bank’s interest in the property for $75,000 if the Butlers did not purchase it. The Butlers did not buy the bank’s interest, and Brazelton, through BP, made the purchase. On October 20, 2003, the bank assigned the promissory note and the mortgage to BP. Gibbons told Jamie that Brazelton, through BP, had bought the bank’s interest in the property.
 

 After the promissory note and mortgage had been assigned to BP, Jamie told Brazelton the Butlers were still interested in purchasing them. Brazelton and Jamie also discussed the possibility of establishing a “shell corporation”
 
 [3]
 
 to foreclose on the mortgage so as to avoid individual liability for the environmental contamination.
 
 [4]
 
 Butler had executed a durable power of attorney appointing Jamie as his attorney in fact, and the Butlers assert that, at all times during the events made the basis of this case, Jamie was acting as Butler’s attorney in fact. Jamie offered Brazelton an existing shell corporation, MaxiStorage. Butler was the sole shareholder of MaxiStorage. Brazelton and Jamie appear to have reached an agreement for the Butlers to buy the interest in the property for $100,000, with $25,000 down and the remaining $75,000 plus ten percent interest due at the end of one year. In addition, the Butlers agreed to provide Brazelton with a “shell corporation” that would foreclose on the mortgage.
 

 Pursuant to the agreement, on October 27, 2003, Jamie gave Brazelton a check for $25,000. On October 29, 2003, Jamie signed a “Bill of Sale” purporting to transfer all Butler’s shares in MaxiStorage to BP. The bill of sale provided in pertinent part as follows:
 

 “KNOW ALL MEN BY THESE PRESENTS: That J.L. Butler, SR, for and in the consideration of the sum of
 
 *1224
 
 Ten and no/100 ($10.00) Dollars, and other good and valuable considerations, to me paid by BRAZELTON PROPERTIES, INC., the receipt whereof is hereby acknowledged, does hereby grant, sell transfer and deliver unto BRAZEL-TON PROPERTIES, INC., the following property, viz:
 

 “100 Shares being 100% of Common Stock of MaxiStorage, Inc., an Alabama Corporation.”
 

 MaxiStorage was intended to be the “shell corporation” that would purchase the property upon foreclosure of the mortgage. No stock certificates were delivered to BP. After the shares were transferred, BP, as the sole shareholder of MaxiStorage, held a meeting at which Butler was dismissed as director and officer of MaxiStorage and Brazelton was elected president. Also on October 29, BP assigned the promissory note and mortgage on the property to MaxiStorage.
 

 On December 1, 2003, MaxiStorage foreclosed on the mortgage. MaxiStorage made the highest and best bid at the foreclosure sale and purchased the property for $76,011. Brazelton provided the money for the purchase. Jamie attempted to give a promissory note to Brazelton, but the note was signed on behalf of MaxiSto-rage. Brazelton said he refused to accept the promissory note because it was signed on behalf of a company he claimed he already owned. The Butlers contended that they owned MaxiStorage, and Jamie refused Brazelton’s request to have Butler be personally liable on the note. Once the dispute over the promissory note arose, Brazelton attempted to return the $25,000 check Jamie had given to him as a down payment for the property, and he said he did not cash any subsequent checks the Butlers gave him toward payment of the money used to buy the property.
 

 Jamie attempted to get a loan from a bank to repay Brazelton in full; however, he was unable to get a loan. He still attempted to pay Brazelton monthly payments; however, Brazelton would not accept them. Jamie went to the property and cut the lock on the gate and took possession of the property. Because Jamie did not have the consent or authorization of Brazelton or BP to take possession of the property, Brazelton issued a termination notice to the Butlers on March 1, 2004. When the Butlers did not vacate the property, Brazelton issued a “notice to quit” and sought delivery of the property. When the Butlers remained in possession of the property, MaxiStorage filed its action for ejectment.
 

 The Butlers, acting pro se, contend that the trial court improperly entered summary judgments in favor of the plaintiffs because, they say, they presented substantial evidence creating genuine issues of material fact as to the ownership of MaxiS-torage and of the property and because the defendants were not entitled to a judgment as a matter of law. We review a summary judgment de novo; we apply the same standard as was applied in the trial court.
 
 Kendrick v. Earl’s Inc.,
 
 987 So.2d 589, 595 (Ala.Civ.App.2007). A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing “that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law.” Rule 56(c)(3);
 
 see Lee v. City of Gadsden,
 
 592 So.2d 1036, 1038 (Ala.1992). If the movant meets this burden, “the burden then shifts to the nonmovant to rebut the movant’s prima facie showing by ‘substantial evidence.’”
 
 Lee,
 
 592 So.2d at 1038 (footnote omitted). “[Sjubstantial evi
 
 *1225
 
 dence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.”
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989);
 
 see
 
 § 12 — 21—12(d), Ala.Code 1975. Furthermore, when reviewing a summary judgment, the appellate court must view all the evidence in a light most favorable to the nonmovant and must entertain all reasonable inferences from the evidence that a jury would be entitled to draw.
 
 Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C.,
 
 792 So.2d 369, 372 (Ala.2000).
 

 The Butlers assert that they presented substantial evidence indicating that they never intended to transfer actual ownership of MaxiStorage to BP, and that the parties understood that the stock “transfer” was simply to allow Brazelton and BP to have a shell corporation for purposes of foreclosing on the property. The Butlers contend that they had no “do-native intent” when agreeing to the transfer of Butler’s shares in MaxiStorage to BP; therefore, they say, the trial court erred in finding that BP was the owner of MaxiStorage. They also point out that no physical stock certificates were transferred from Butler to Brazelton or BP, and thus, they argue, there was no effective transfer of stock ownership. To support their contention, the Butlers rely on Article 8 of Alabama’s version of the Uniform Commercial Code, § 7-8-101 et seq., Ala.Code 1975, which, they argue, requires a physical delivery of a certificate to complete a transfer of stock ownership.
 

 In its judgment finding that BP owned MaxiStorage, the trial court held that the Butlers’ argument must fail because “prevailing case law holds that a transfer of ownership of stock can occur without delivery of the physical stock certificate.” The trial court stated that, under Alabama law, the transfer of stock can be achieved without physical delivery of a stock certificate in three situations: by constructive delivery, by equitable assignment, or by gift. From the order, it appears that the trial court found that the transfer of stock from Butler to BP was an equitable assignment. The court found that the analyses in
 
 Andrews v. Troy Bank & Trust Co.,
 
 529 So.2d 987 (Ala.1988), and
 
 Johnson v. Johnson,
 
 273 Ala. 688, 144 So.2d 12 (1962), upon which the
 
 Andreivs
 
 court relied, were applicable to this case.
 

 In
 
 Andrews,
 
 John Andress, who owned shares of common stock in Troy Bank and Trust Company (“the Troy bank”), wished to establish joint ownership in the stock with his wife, Lessie. Andress took the stock certificates to the Troy bank, which added “Mr. or Mrs.” to the original certificates issued to Andress. The Troy bank also changed its stockholders’ register and dividend records to reflect that the stock was owned by Mr. or Mrs. Andress. When John Andress died, Lessie indorsed and surrendered the certificates to the Troy bank and had them reissued in her name. The Troy bank, believing that the certificates were “joint survivorship” certificates, did so.
 
 Andrews,
 
 529 So.2d at 988-89.
 

 Andrews was the executor of John An-dress’s estate. He sued Lessie Andress and the Troy bank seeking a declaration of ownership of the stock. Our supreme court determined that the actions taken by John Andress in having Lessie Andress added as a co-owner of the stocks constituted an equitable assignment of an interest in the stock to Lessie “even though he never actually indorsed the certificates and never physically delivered the certificates.”
 
 Id.
 
 at 992 (footnote omitted). The supreme court specifically found that “[t]he evidence clearly supports the trial court’s
 
 *1226
 
 finding that it was the intent of Mr. An-dress to make Mrs. Andress a co-owner of the stock in question.”
 
 Id.
 

 The supreme court also held that there had been a constructive delivery of the stock to Lessie Andress, quoting favorably an Idaho Supreme Court case holding that,
 

 “ ‘[w]hile the requirement of physical delivery contained in [UCC] Article 8 may serve a valid evidentiary purpose in the case of a sole owner, where, as here, there is more than one listed owner, the requirement that the new owners personally receive physical possession of the stock certificates to constitute a valid transfer is not applicable because both joint tenants cannot enjoy possession simultaneously.... This result is especially appealing because possession by one co-owner is deemed possession by all.’ ”
 

 Andrews,
 
 529 So.2d at 991, quoting
 
 Ogilvie v. Idaho Bank & Trust Co.,
 
 99 Idaho 361, 365, 582 P.2d 215, 219 (1978).
 

 Johnson,
 
 the other case the trial court in this case relied upon in determining that delivery of the stock certificates to Brazel-ton or BP was not required, involved an action in equity by an alleged joint owner of corporate stock to compel the sale of the stock and the division of the proceeds among the alleged joint owners, all of .whom were siblings attempting to determine the ownership interest of stock held by their deceased parents and their uncle. At issue was whether there had been a valid transfer of stock pursuant to the Uniform Stock Transfer Act (“the USTA”), which, at the time
 
 Johnson
 
 was decided, was codified at Title 10, § 48, Ala.Code 1940 (Recomp.1958).
 
 [5]
 

 The
 
 Johnson
 
 court held that the transfer of corporate stock, in the strict or technical sense, was not involved in that case, and that the USTA was without controlling influence. The court concluded that, as a matter of law, the rule of equitable assignment of corporate stock was not abrogated by the adoption of the USTA. Accordingly, Alabama law continues to recognize the equitable principle that, as between the parties, there may be a transfer of ownership of stock in a corporation when the owner presently intends to make such a transfer even though there is some technical defect in the mode of transfer.
 
 See Johnson,
 
 supra; and
 
 Nashville Trust Co. v. Cleage,
 
 246 Ala. 513, 21 So.2d 441 (1945).
 

 The circumstances involving the stock transfer at issue here are distinguishable from those in
 
 Andrews
 
 and
 
 Johnson.
 
 BP and Butler were never co-owners of the stock at issue. Furthermore, the Butlers presented evidence indicating that the parties never intended that there be a transfer of ownership in MaxiStorage. Instead,
 
 *1227
 
 they say, the intention of the parties was simply to provide Brazelton or BP with a shell corporation to foreclose on the mortgage on the property so the parties could avoid individual liability for the environmental contamination on the property. In
 
 Andrews,
 
 one of the cases the trial court relied upon, the supreme court acknowledged the distinction between the circumstances in
 
 Morris v. Kaiser,
 
 292 Ala. 650, 299 So.2d 252 (1974), and those in
 
 Andrews,
 
 stating, “[i]n the usual case, actual physical possession of the security by the purchaser is necessary to complete a transfer of ownership in the security.
 
 Moms,
 
 supra. However, in the present case, Mr. Andress did not attempt to bestow on his wife complete ownership of the stock but, rather, he sought to make her a co-owner of the stock.”
 
 Andrews,
 
 529 So.2d at 991. The circumstances in this care are more closely akin to those in
 
 Morris
 
 than to those in
 
 Andrews
 
 and
 
 Johnson.
 

 In
 
 Morris,
 
 the appellant contended that he was a bona fide purchaser of bearer-bond securities, even though he had not physically taken delivery of them, because, he said, “constructive or symbolic delivery occurred when [the appellee] executed and delivered a written bill of sale to him.”
 
 Morris,
 
 292 Ala. at 652, 299 So.2d at 253. The appellant also contended that his “constructive possession” of the securities, with his right to have actual delivery of them, equated to their physical delivery to him.
 

 Under Article 8 of Alabama’s version of the UCC, which governs investment securities such as stock certificates, § 7-8-102, Ala.Code 1975, a “protected purchaser” is a purchaser for value in good faith and without notice of any adverse claim who obtains control of the security. § 7-8-308, Ala.Code 1975. “Delivery” of securities occurs when the purchaser acquires possession of the security certificate, or someone designated by the purchaser acquires possession of a security, or when an identified security is still in the possession of a third person when that person acknowledges that he or she holds the security for the purchaser. § 7-8-301, AIa.Code 1975.
 

 The
 
 Morris
 
 court held that securities were not like goods governed by Article 2 of the UCC and that it could not “agree therefore that a bill of sale of the securities is sufficient to constitute delivery within the purview of the statute defining a bona fide purchaser of securities.”
 
 Morris,
 
 292 Ala. at 653, 299 So.2d at 254. The court continued:
 

 “It is quite clear to us that the appellant never became a bona fide purchaser because he never took delivery of the securities by acquiring actual physical possession of them. They remained in the possession of the Bank, and the Bank did not at any time acknowledge that it held the securities for the purchaser. The appellant acquired possession of the purported bill of sale to the securities, but he did not acquire delivery and possession of the securities themselves. Delivery to a purchaser only occurs when he or a person designated by him acquires actual physical possession of a security.”
 

 Morris,
 
 292 Ala. at 653, 299 So.2d at 255.
 

 The trial court’s reliance on
 
 Andrews
 
 and
 
 Johnson
 
 was misplaced. The holdings in
 
 Andrews
 
 and
 
 Johnson
 
 lead us to conclude that the transferee still must obtain physical possession of securities such as shares of stock for the transfer to be valid, with two exceptions: (1) when the transferor attempts to transfer only partial ownership so that he or she becomes a co-owner with his or her transferee, and (2) when an identified security to be delivered is still in the possession of a third person when that third person acknowledges that he or she holds the security for the pur
 
 *1228
 
 chaser. Neither exception is present in this case; therefore, the law as stated in
 
 Moms,
 
 and acknowledged by the court in
 
 Andrews
 
 — i.e., that an effective transfer of stock requires physical possession in the transferee — controls.
 

 The evidence is undisputed that neither Brazelton nor BP was given physical possession of stock certificates for MaxiStorage. Brazelton and BP’s argument that no stock certificates had been created, so there was nothing physical to obtain, is not determinative. As in the cases cited above, in which the transferor arranged for new certificates to be issued in the co-owners’ names, the Butlers could easily have had stock certificates issued in BP’s name and given Brazelton or BP possession of the newly issued certificates. Furthermore, as.
 
 Morris
 
 holds, the bill of sale was insufficient to constitute a transfer of shares from Butler to Brazelton or BP. Accordingly, Brazelton and BP failed to show that, as a matter of law, one or both were entitled to a judgment as a matter of law as to the ownership of Max-iStorage.
 

 Even if we were to hold that a physical transfer of stock certificates was not needed in this case, the Butlers’ provided substantial evidence — including their testimony — that tended to show that the parties intended only to provide Brazelton or BP with a shell corporation for purposes of foreclosing on the property and that they did not intend an actual change in ownership of MaxiStorage. The Butlers’ evidence creates a genuine issue of material fact; therefore, a summary judgment based on equitable assignment, which, as related in the holdings in the cases cited above, requires an intention to transfer ownership on the part of the transferors, was improper. In his deposition, Brazelton acknowledged that he did not provide consideration for the “purchase” of stock of MaxiStorage. Failure to provide any payment for MaxiStorage tends to support the Butlers’ theory of the case that transfer of ownership of MaxiS-torage was not actually contemplated by the parties. The Butlers’ lack of effort to have stock certificates issued to Brazelton or BP and to have those certificates delivered also tends to support their contention that no actual transfer of ownership was intended by the parties.
 

 The contested evidence as to the intention of the parties as to the ownership of MaxiStorage creates a genuine issue of material fact. Neither Brazelton nor BP had physical possession of the stock certificates of MaxiStorage, and the evidence was disputed as to whether the parties intended to vest ownership of MaxiStorage in Brazelton or BP. Therefore, a summary judgment in favor of Brazelton and BP regarding ownership of MaxiStorage was improper and must be reversed.
 

 Because the ownership of MaxiStorage is not settled, the subsequent ownership of the property remains at issue. Thus, those portions of the trial court’s summary judgments determining the ownership of the property and ejecting the Butlers from the property are also due to be reversed. Because the summary judgments are due to be reversed in their entirety, we also need not determine the other issues the Butlers raise on appeal.
 

 For the reasons set forth above, the summary judgments entered in favor of MaxiStorage, Brazelton, and BP are due to be reversed in their entirety, and the cause is remanded for further proceedings consistent with this opinion.
 

 REVERSED AND REMANDED.
 

 PITTMAN, BRYAN, THOMAS, and MOORE, JJ., concur.
 

 [1]
 

 . The Butlers initially appealed after the entry of the second summary judgment; however, one claim was still pending, and on December 12, 2007, this court, without opinion, dismissed the appeal because it was not from a final judgment. The final claim was dismissed on July 2, 2008, and on August 12, 2008, the Butlers filed a timely notice of appeal.
 

 [2]
 

 . The record does not provide details regarding the underlying promissory note and mortgage, but the foreclosure deed indicates that the previous owners of the property had defaulted on the mortgage.
 

 [3]
 

 . Presumably, by "shell corporation” the parties meant a corporation without assets.
 

 [4]
 

 . The parties did not raise the legality of the "shell corporation," which, the Butlers say, was intended to be used to shelter the parties from liability for environmental contamination of the property. This court does not condone sham corporations under any circumstances. However, illegality is an affirmative defense, Rule 8(c), Ala. R. Civ. P., and our supreme court has held that failure to plead illegality precludes appellate-court review of the matter.
 
 Kershaw v. Knox Kershaw, Inc.,
 
 523 So.2d 351 (Ala.1988) (holding that the defendant's failure to plead the affirmative defense of the alleged illegality of a contract provision precluded consideration of that defense). Because the parties did not raise the issue of the legality of the shell corporation at trial or on appeal, this court cannot consider the issue.
 

 [5]
 

 . That former Code section provided:
 

 "Title to a certificate and to the shares represented thereby can be transferred only, by delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby, or by delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign, or transfer the same or the shares represented thereby, signed by the person appearing by the certificate to be the owner of the shares represented thereby. Such assignment or power of attorney may be either in blank or to a specified person. The provisions of this section shall be applicable although the charter or articles of incorporation or code of regulations or by-laws of the corporation issuing the certificate and the certificate itself provide that the shares represented thereby shall be transferable only on the books of the corporation or shall be registered by a registrar or transferred by a transfer agent.”
 

 Cf.
 
 §§ 7-8-301, 7-8-307, 7-8-309, and 7-8-313, Ala.Code 1975.