TRIBUNE PUBLISHING COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

NEWS REVIEW PUBLISHING CO., INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 12216–81, 12471–81.    Filed December 20, 1982.

---

*D. John Thornton* and *Thomas D. Cochran*, for the petitioners.

*Wayne R. Appleman*, for the respondent.

FEATHERSTON, *Judge*: Respondent determined deficiencies in the Federal income taxes of petitioners in these consolidated cases as follows:

| Petitioner | Year | Deficiency |
|---|---|---|
| Tribune Publishing Co .................... | 1976 | $14,789 |
| | 1977 | 3,603 |
| News Review Publishing Co., Inc ...... | 1976 | 13,500 |
| | 1977 | 13,558 |
| | 1978 | 13,500 |

After concessions by the parties, the only issue remaining for decision is whether, during 1976, 1977, and 1978, petitioners constituted a parent-subsidiary controlled group of corporations within the meaning of section 1563(a)(1).[1] The resolution of that issue depends on whether certain stock in petitioner News Review Publishing Co., Inc., constituted "excluded stock," as defined in section 1563(c)(2)(A), and the answer determines the amount of the surtax exemption to which petitioners are entitled.

## FINDINGS OF FACT

Petitioners Tribune Publishing Co. (Tribune) and News Review Publishing Co., Inc. (News), are corporations organized and operated under the laws of Idaho. Their respective principal places of business were Lewiston, Idaho, and Moscow, Idaho, when their petitions were filed. Both petitioners filed Federal corporate income tax returns for all of the years in question with the Internal Revenue Service Center, Ogden, Utah.

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the tax years in issue, unless otherwise noted.

During the years in issue, both Tribune and News were locally owned newspaper publishing companies, as opposed to chain-owned companies.[2] Tribune published a morning newspaper in Lewiston named the Lewiston Tribune. News published an afternoon newspaper in Moscow, about 30 miles north of Lewiston, named the Daily Idahonian (the Idahonian). News also conducted a substantial commercial printing business. Although the two newspapers were strongly identified with their respective cities, they both served the same general area and there were a "significant number" of readers who subscribed to both papers.

During the years in issue, Tribune was owned, either individually or in trust, by about a dozen members of the Alford family, several of whom served as corporate officers. Prior to the acquisition, described below, of a block of News shares by Tribune in 1967, most of the stock of News was owned by two members of the Marineau family, William T. Marineau (hereinafter William) and his son, A. J. Marineau (hereinafter A. J.), and by the company's executives. William was the president and publisher of News, and A. J. was its vice president and general manager.

The owners and managers of Tribune and News enjoyed cordial relations with one another. In the words of A. L. Alford, Jr. (hereinafter A. L., Jr.), the president of Tribune: "There was a neighbor atmosphere * * * a well-established, very long relationship between the two newspapers and the families involved." The two companies were "friendly competitors."

In 1967, the shareholders of News received an offer for their stock from a large national newspaper chain. All of the shareholders except the two Marineaus wished to accept the offer, causing William to become concerned about the prospect of the control of the paper leaving the community. He contacted A. L., Jr., at the offices of the Tribune and explained

---

[2]The distinction was explained by Tribune's president, A.L. Alford, Jr., as follows:

"A family owned newspaper is often referred to as a community newspaper. It's owned by persons or a family which generally live in the area which the newspaper serves. * * *

"A chain newspaper, as opposed to that, * * * is more than one newspaper under a common ownership; usually a great number. * * *

"A chain newspaper, therefore, is a set of newspapers which is not managed and owned in the locality which that newspaper serves."

his concern. He also pointed out that it would be to Tribune's disadvantage for a chain newspaper to be located only 30 miles away from Lewiston. William suggested that the Tribune, "as a neighbor and as friends," might buy the stock of News that was up for sale to the national chain. A. L., Jr., shared William's conviction regarding the desirability of home ownership of the area's newspapers, and agreed to discuss the purchase of News shares by Tribune with his brother and his father.[3] Several days later, the Alfords decided that Tribune would purchase some of the shares of News that were up for sale. Other shares offered for sale were purchased by A. J. The remaining shares sold were purchased by E. Russell Short, a Moscow businessman, and his daughter, Reta S. Tate.

A contract of sale was executed and the sale was closed on April 14, 1967. Following the sale, the outstanding News stock, all of one class, was owned as follows:

| Stockholder | Number of shares |
|---|---|
| Tribune Publishing Co | 100 |
| A. J. Marineau | 50 |
| William T. Marineau | 25 |
| E. Russell Short and Reta S. Tate | 75 |
| Total | 250 |

On April 15, 1967, the day following the purchase and sale, the stockholders of News entered into an agreement (the 1967 agreement). A. L., Jr., and Charles Alford[4] were also parties to the agreement. They were grouped with Tribune as "parties of the first part" and referred to in the agreement as "party purchasers" even though they had not, as individuals, purchased any stock in News. The agreement stated that the parties desired to—

obligate themselves as to their future rights, privileges and obligations as stockholders for the protection of their individual interests and to bind themselves, their heirs and successors, as more particularly herein set forth
* * *

The agreement provided that certain conditions were re-

---

[3] A. L., Jr.'s father, A. L. Alford, Sr., was president of Tribune at the time.

[4] Charles Alford was the brother of A. L., Jr. At the time the agreement was entered into, he was Tribune's assistant publisher and advertising director.

quired to be met before a shareholder could sell his shares. The "parties of the first part," that is, Tribune and the two Alfords, were granted "the sole and exclusive first option to meet any bona fide offer of sale" to be received by any of the remaining stockholders for his News stock. If Tribune desired to sell its stock in News, the agreement similarly gave the remaining shareholders the right to "meet the terms" of the proposed sale.

The agreement provided that:

It is specifically understood that any conveyance by gift, inheritance, assignment or otherwise wherein and whereby any interest in the stock of the News-Review Publishing Company, Inc., now or hereafter held by any stockholder shall be subject to the provisions of this Stockholders' Agreement, unless and until all stockholders shall have agreed, in writing, to waive or modify any of the terms hereof as to any conveyance, gift or sale of said stock * * *

The terms of the restrictions on disposal of the News stock were never printed on any of the actual stock certificates.

Tribune acquired additional shares in News in 1972, when E. Russell Short and Reta S. Tate decided to sell their interest in the company. Once again, William contacted A. L., Jr., and informed him of the proposed sale, and Tribune stepped in and bought the shares. Following the purchase of the Short/Tate shares by Tribune, and throughout the period here in issue, the stock of News was owned as follows:

| Stockholder | Number of shares |
|---|---|
| Tribune Publishing Co | 175 |
| A. J. Marineau | 50 |
| William T. Marineau | 25 |
| Total | 250 |

Tribune did not formally invoke its right of first refusal under the 1967 agreement in order to acquire the Short/Tate shares. The 1967 agreement was, however, incorporated by reference in the agreement by which Short and Tate assigned their shares to Tribune.

During the years here in issue, William and A. J., in addition to being shareholders in News, were also salaried employees of the company. William was the company's vice president and A. J. was its secretary-treasurer.

Tribune's investment in News proved satisfactory to all

concerned. The relationship between the Alfords and the Marineaus continued to be characterized by friendship and mutual respect. Although Tribune owned 70 percent of the News stock and A. L., Sr., and A. L., Jr., were, at different times, officers or directors of News, the Alfords did not attempt to dominate or control the day-to-day management of the company or involve themselves in the operation of its newspaper, the Idahonian.[5]

In 1976, the two Marineaus decided to transfer some of their stock to other members of their family for estate planning purposes.[6] Because of Tribune's right of first refusal under the 1967 agreement, A. J. contacted A. L., Jr., to make sure that Tribune would agree to the proposed transfers within the Marineau family. A. L., Jr., informed A. J. that Tribune had no desire to purchase the stock to be transferred and that "anything they wanted to do with their stock within the family" would have Tribune's approval. A. J. proposed that the 1967 agreement should be amended so that there would be no "problems" or "misunderstandings" caused by the transfers. A. L., Jr., suggested that A. J. "go ahead and have his attorney prepare such language that would put their mind at ease." Subsequently, at the annual meeting of the board of directors of News, held on April 26, 1976, A. L., Jr., moved that the following resolution (the 1976 resolution) be adopted:

BE IT RESOLVED, that it is and shall be the policy of the Board of Directors that the restrictions imposed by that certain Stock Agreement, dated the 15th day of April, 1967, * * * shall not be construed to restrict the said A. J. Marineau * * * or W. T. Marineau * * * from making a conveyance of his stock interest of, in and to this corporation to any member or members of his family, either by way of a valid gift inter vivos or by testamentary device, it being understood that such restrictions would not thereafter apply insofar as the beneficiaries or devisees of A. J. Marineau or W. T. Marineau would be concerned.

---

[5] In the words of A. L., Jr.:

"We entered into * * * [the purchase of News stock] on the basis of helping a respected newspaper family keep the chains out. We didn't want the chains 30 miles away from us. * * * We, from day one of our investment there, relied upon the Marineau family to run the present and future operation of that newspaper and commercial printing firm. We made it known to them that that was how we felt * * *. Maybe that's part why they asked us rather than, perhaps, somebody else because they probably had a pretty good idea of what our feeling would be and the amount of respect we had and do have for them."

[6] The planned transfers were not completed until after the period here in issue.

The motion was seconded by A. J. and duly approved.[7] No other steps were shown to have been taken pursuant to the discussion between A. J. and A. L., Jr., with respect to transfers of News stock within the Marineau family.

On January 15, 1979, following the death of William, 12.5 of the 25 shares of News he had owned were issued to his surviving spouse, Sophia Marineau, and the remaining 12.5 shares were issued to the William T. Marineau Trust A.

In a letter dated March 6, 1979, A. J. informed A. L., Jr., that he had decided that the entire Marineau interest in News would be put up for sale. A. J. expressed his regret at reaching the decision to sell the family's interest in the company his father had founded, but stated that estate planning consider-ations led him to conclude that it was the wisest course to follow. The letter offered the Marineau family's 75 shares of News stock for sale to Tribune "under the terms of the buy sell agreement" and suggested that the Alfords and the Marineaus each have the stock appraised by an independent firm "to give us a professional valuation from which to base our sales contract." The minutes of a special meeting of the Tribune board of directors, held on April 18, 1979, show that—

the offer was formally accepted under terms of the buy-sell agreement, and Tribune management was directed to proceed with the Marineaus in determining a fair method of valuation and appraisal.

The sale fell through, however, when the firms engaged by the Marineaus and the Alfords to appraise the stock reported widely differing values. The Marineaus' remaining 75 shares of News were sold, instead, to El Dorado Newspapers, a California corporation, on September 24, 1980.

Respondent determined that, for the years in question, Tribune and News were a "controlled group of corporations as described in Section 1563 of the Internal Revenue Code."[8]

---

[7]The directors of News at the time of the 1976 resolution were Mary Alice Matlock, A. L., Jr., and A. J. Mary Alice Matlock and A. L., Jr., were also shareholders and officers or former officers of Tribune. Mary Alice Matlock, now deceased, was a member of the Alford family. In 1976, she owned about 13 percent of the stock of Tribune. She had served as a vice president and director of Tribune, although it is not clear whether she still held those offices in 1976. A. L., Jr., owned about 9 percent of the stock of Tribune and was the president and a director of the company.

[8]The notice of deficiency issued to Tribune shows stated amounts of deficiencies for 1976 and 1977 and $0 for 1975 and 1978. Although Tribune had taxable income for both 1975

OPINION

Section 1561(a)(1), as in effect for the taxable years in issue, limited the "component members of a controlled group of corporations" to one surtax exemption.[9] This limitation increased the amount of the total taxable income of the controlled group that was subject to the surtax on corporate taxable income.[10]

One type of controlled group of corporations is a parent-subsidiary controlled group,[11] which is defined in section 1563(a)(1) as:

One or more chains of corporations connected through stock ownership with a common parent corporation if—

(A) stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of each of the corporations, except the common parent corporation, is owned * * * by one or more of the other corporations; and

(B) the common parent corporation owns * * * stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of at least one of the other corporations, excluding, in computing such voting power or value, stock owned directly by such other corporations.

In determining whether the stock ownership tests of section 1563(a)(1) are satisfied, some of the outstanding stock of the subsidiary corporations in the group is disregarded in certain circumstances. Section 1563(c), in pertinent part, provides as follows:

SEC. 1563(c). CERTAIN STOCK EXCLUDED.—

(1) GENERAL RULE.—For purposes of this part, the term "stock" does not include—

\* \* \* \* \* \* \*

(C) stock which is treated as "excluded stock" under paragraph (2).

---

and 1978, it reported no tax liability and the adjustments determined in the notice produced none due to the application of investment and new jobs tax credits. Because no deficiency was determined for 1975 and 1978, this Court lacks jurisdiction with respect to Tribune's tax liability for those years even though the application of our holding may affect the amount of the credits subject to carryover or carryback. *Martz v. Commissioner*, 77 T.C. 749 (1981).

[9]Sec. 11(d).

[10]Sec. 11(c).

[11]There are also several other kinds, including "brother-sister controlled groups" and "combined groups." Sec. 1563(a). Respondent does not argue that News and Tribune constituted one of these other kinds of controlled groups.

(2) Stock treated as "excluded stock".—

(A) Parent-subsidiary controlled group.—For purposes of subsection (a)(1), if a corporation (referred to in this paragraph as "parent corporation") owns * * * 50 percent or more of the total combined voting power of all classes of stock entitled to vote or 50 percent or more of the total value of shares of all classes of stock in another corporation (referred to in this paragraph as "subsidiary corporation"), the following stock of the subsidiary corporation shall be treated as excluded stock—

\* \* \* \* \* \* \*

(iii) stock in the subsidiary corporation owned * * * by an employee of the subsidiary corporation if such stock is subject to conditions which run in favor of such parent (or subsidiary) corporation and which substantially restrict or limit the employee's right * * * to dispose of such stock.

During 1975 through 1978, Tribune owned more than 50 percent (175 of 250 shares) of News' outstanding stock, satisfying the ownership requirement of section 1563(c)(2)(A). Respondent has determined that, because the 1967 agreement gave Tribune a right of first refusal in the case of a proposed sale by any of the other shareholders, the News stock owned by A. J. and William constituted "stock in the subsidiary corporation owned * * * by an employee of the subsidiary corporation" which was "subject to conditions which run in favor of * * * [the] parent * * * and which substantially restrict or limit the employee's right * * * to dispose of such stock" within the meaning of section 1563(c)(2)(A)(iii). Accordingly, respondent has determined that the Marineaus' stock was "excluded stock." If this determination is correct, then it follows, as respondent has also determined, that petitioners constituted a parent-subsidiary controlled group because, disregarding the Marineaus' stock, Tribune owned 100 percent of News (compared with the "at least 80 percent" requirement of section 1563(a)(1)) during the years in question and it is undisputed that the Marineaus were employees of News.[12]

---

[12]For purposes of sec. 1563, the term "employee" is defined as in sec. 3121(d)(1) and (2). Sec. 1563(f)(1). That definition includes corporate officers. As to the reason for treating employee-owned restricted stock as "excluded stock," the following statement in S. Rept. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 655, is instructive:

"certain outstanding stock, although owned by separate persons, could, unless neutralized for purposes of determining control, be used by some owners as a means of divesting themselves of sufficient stock to avoid the application of this section without, as a practical matter, divesting themselves of the benefits of ownership of a corporation. Therefore, in determining whether a parent-subsidiary controlled group exists, stock of a subsidiary

Therefore, we must decide only whether Tribune's right of first refusal under the 1967 agreement constituted a condition running in favor of Tribune which "substantially" restricted the Marineaus' right to dispose of their stock.

Guidance as to what constitutes a condition running in favor of the parent which substantially restricts an employee's right to dispose of his stock is found in section 1.1563–2(b)(2)(iii), Income Tax Regs., as follows:

> In general, any condition which extends, directly or indirectly, to the parent corporation * * * preferential rights with respect to the acquisition of the employee's * * * stock will be considered to be a condition * * * [described in section 1563(c)(2)(A)(iii)]. It is not necessary, in order for a condition to be considered to be in favor of the parent corporation * * * that the parent * * * be extended a discriminatory concession with respect to the price of the stock. For example, a condition whereby the parent corporation is given a right of first refusal with respect to any stock of the subsidiary corporation offered by an employee for sale is a condition which substantially restricts or limits the employee's right to dispose of such stock and runs in favor of the parent corporation. * * *

Consistent with this regulation, the legislative history of section 1563 also indicates that a right of first refusal in the parent corporation is a substantial restriction on the sale of stock in the subsidiary by an employee of the subsidiary. H. Rept. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2) 452.[13]

Tribune's right of first refusal under the 1967 agreement is precisely described in the quoted regulation. We must hold,

corporation owned by * * * employees of the subsidiary if the stock is subject to restrictions which favor the parent or subsidiary corporation * * * will not be treated as outstanding stock if the parent corporation owns 50 percent or more of the value or voting power of the stock of the subsidiary. * * * "

See also H. Rept. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2) 445, 452.

[13]H. Rept. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2) 452, reads in part as follows:

"Subparagraph (A)(iii) specifies as excluded stock any stock in a subsidiary corporation which is owned (within the meaning of sec. 1563(d)(2)) by an employee of the subsidiary corporation if such stock is subject to conditions which run in favor of the parent corporation or subsidiary corporation and which substantially restrict or limit the employee's right (or, if the employee constructively owns such stock, the direct owner's right) to dispose of the stock. As used in subparagraph (A)(iii), the term "employee" includes an officer of the corporation (see sec. 1563(f)(1) for the definition of "employee" for purposes of sec. 1563). An example of a condition which substantially restricts or limits an employee's right to dispose of his stock within the meaning of subparagraph (A)(iii) is a condition whereby the parent corporation is given a right of first refusal if such stock is offered for sale."

therefore, that the Marineaus' stock was "excluded stock" during the years in issue. With the Marineaus' stock "treated as if it were not outstanding" (sec. 1.1563–2(b)(2), Income Tax Regs.), Tribune owned all, not merely the "at least 80 percent" specified in section 1563(a)(1), of the News stock. As a consequence, Tribune and News constituted a parent-subsidiary controlled group of corporations during those years.[14]

In support of their contention that the Marineaus' stock in News was not excluded stock, petitioners argue that the 1967 agreement did not constitute a substantial restriction on the Marineaus' right to dispose of their stock, because the right of first refusal provided for in the agreement was reciprocal.[15] Petitioners cite section 1.1563–2(b)(4)(ii), Income Tax Regs., concerning the definition of excluded stock "for purposes of determining whether a corporation is a member of a brother-sister controlled group of corporations." It is there provided that:

For purposes of this subdivision, if a condition which restricts or limits an employee's right * * * to dispose of his stock also applies to the stock in such corporation held by such common owner pursuant to a bona fide reciprocal stock purchase arrangement, such condition shall not be treated as one which restricts or limits the employee's * * * right to dispose of such stock. An example of a reciprocal stock purchase arrangement is an agreement whereby a common owner and the employee are given a right of first refusal with respect to stock of the employer corporation owned by the other party.[16]

Petitioners' reliance on this regulation is misplaced. The applicability of the quoted passage is explicitly limited to subdivision (ii), and that subdivision deals only with "brother-sister" controlled groups. Consequently, the passage relied on

---

[14]True, the "controlled group of corporations" here consisted only of Tribune and News, but a chain of corporations may consist of only two corporations, one of which is the parent. Sec. 1.1563–1(a)(2)(ii), example (1), Income Tax Regs., provides:

(ii) The definition of a parent-subsidiary controlled group of corporations may be illustrated by the following examples:

*Example (1):* P Corporation owns stock possessing 80 percent of the total combined voting power of all classes of stock entitled to vote of S Corporation. P is the common parent of a parent-subsidiary controlled group consisting of member corporations P and S.

[15]As stated in our findings of fact, the agreement gave Tribune a right of first refusal in case any of the other shareholders desired to sell their stock in News, and also gave the other shareholders a similar right in case Tribune desired to sell.

[16]The "common owner" of the corporations in a brother-sister controlled group is roughly analogous to the parent corporation in a parent-subsidiary controlled group.

by petitioner does not limit the scope of the definition of excluded stock contained in section 1.1563–2(b)(2)(iii), Income Tax Regs., also quoted above, concerning parent-subsidiary controlled groups.

The regulation reflects the statute in this respect. Section 1563(c)(2)(A), concerning excluded stock in members of parent-subsidiary controlled groups and set forth in part above, contains no reference to the reciprocity of a restriction on disposition of an employee's stock. Section 1563(c)(2)(B)(ii), on the other hand, concerning brother-sister controlled groups, provides that, if a stock ownership requirement set forth in section 1563(c)(2)(B) is satisfied, then "excluded stock" includes:

(ii) stock in such corporation owned * * * by an employee of the corporation if such stock is subject to conditions which run in favor of any of such common owners (or such corporation) and which substantially restrict or limit the employee's right * * * to dispose of such stock. If a condition which limits or restricts the employee's right * * * to dispose of such stock also applies to the stock held by any of the common owners pursuant to a bona fide reciprocal stock purchase arrangement, such condition shall not be treated as one which restricts or limits the employee's right to dispose of such stock, * * *

Thus, in the statute as in the regulations, the exception for reciprocal stock purchase arrangements is limited to brother-sister controlled groups. Because the question in the present cases is whether petitioners constituted a parent-subsidiary controlled group, the exception for reciprocal restrictions is inapposite.[17]

Petitioners next contend that Tribune's right of first refusal was rendered insubstantial in 1976 when the 1967 agreement was purportedly amended to allow the Marineaus to convey their stock to family members, who would then allegedly hold the stock free of any restrictions. We do not agree.

The "amendment" to which petitioners refer is apparently the resolution passed at News' board of directors meeting on April 26, 1976, set forth in our findings, to the effect that it shall be the "policy" of News' board of directors to permit the Marineaus to transfer their shares of stock to other family

---

[17]Petitioners' citation of *Superior Beverage Co. of Marysville, Inc. v. Commissioner*, 525 F.2d 186 (9th Cir. 1975), revg. 58 T.C. 918 (1972), is inapposite for the same reason.

members. We do not think this resolution amended the 1967 agreement. In the first place, we do not think that the directors of News had the power to amend the 1967 agreement. News was not a party to that agreement which was between Tribune and News' other shareholders. It gave Tribune and the two Alfords a right of first refusal if one of the other shareholders proposed to sell his stock. As quoted in our findings, it specifically provided that its restrictions on disposal of News stock were to be effective in the case of "gift, inheritance, assignment or otherwise" unless they were waived or modified in writing by all of the News shareholders. Tribune, the record owner of 70 percent of the News stock at the time the resolution of the News board was adopted, did not participate in the board's resolution,[18] and we do not think that that resolution diminished Tribune's rights under the 1967 agreement. Secondly, the resolution does not, on its face, even purport to amend the 1967 agreement, but merely states the "policy" of News' directors as to how they will construe the agreement. That policy, unilaterally adopted, could be unilaterally changed.

Petitioners next argue that they are not within the intended scope of the definition of a controlled group of corporations because they had no tax-avoidance motive in choosing their corporate structure. The application of sections 1561 through 1563, however, does not depend upon the existence of tax-avoidance motives. *Barton Naphtha Co. v. Commissioner*, 56 T.C. 107, 116 (1971). Although *Barton Naphtha* concerned a brother-sister controlled group, its holding on the lack of necessity of a tax-avoidance motive is applicable to sections 1561 through 1563, generally.

Petitioners also quote part of the following passage from the report of the Committee on Ways and Means of the House of Representatives at the time of the enactment of sections 1561 and 1563:

> While your committee recognizes the advantages of use of multiple

---

[18]As noted in our findings of fact, two of News' directors, Mary Alice Matlock and A. L., Jr., owned between them about 22 percent of the stock of Tribune, and were either former or sitting officers and directors of Tribune, but the record does not establish, and petitioners do not argue, that their participation in the resolution of the News board was binding on Tribune.

corporations, your committee believes, as it has in the past, that where corporations owned and controlled by the same interests engage in different businesses in the same area or conduct the same type business in different geographical locales, there are legitimate business reasons for use of separate corporations and, therefore, the separate corporations should generally be recognized as separate taxpayers, retaining the benefit of use of multiple surtax exemptions. However, your committee does not intend to encourage the formation of these multiple corporations and therefore proposes to apply higher tax rates to corporations which are members of an affiliated group of corporations. * * *

H. Rept. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2) 242.[19]

Even if we were to agree with petitioners that this general statement of the statute's purpose should control the specific provisions enacted, should there be any conflict between the two, we do not find petitioners' situation described in the quoted passage. The petitioner corporations were not engaged in different businesses in the same area or the same business in different areas but, as described in our findings, in the same business in the same general area. Petitioners considered themselves competitors, albeit friendly ones, and there was a substantial number of families that read both papers. The quoted passage is, for that reason alone, of no help to petitioners.

Petitioners also argue that the stockholders' agreement is not a substantial restriction on their right to dispose of their shares because the agreement is unenforceable under State law. We do not agree with petitioners. Petitioners' argument is based largely on a repealed Idaho statute, although they argue as if it were still in force. Petitioners state:

Idaho Code Section 29–415 provides:
There shall be no lien in favor of a corporation upon the shares represented by a certificate issued by such corporation and there shall be no restriction upon the transfer of shares so represented by virtue of any bylaws of such corporation, or otherwise, unless the right of the corporation to such lien or the restriction is stated upon the certificate.

Petitioners then argue that the restriction embodied in the stockholders' agreement was unenforceable because it was not stated on the News stock certificates.

---

[19]The report of the Committee on Finance of the Senate contains substantially identical language. S. Rept. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 653–654.

The statute relied on by petitioners was based on section 15 of the Uniform Stock Transfer Act. It was enacted by the legislature of the State of Idaho in 1927 as Idaho Code, section 29–415, to become effective January 1, 1928. 1927 Idaho Session Laws ch. 88, sec. 15, at 107. That section was renumbered section 30–415 in 1948. The Idaho legislature, however, repealed the section, along with the rest of the Uniform Stock Transfer Act, effective December 31, 1967. 1967 Idaho Session Laws, ch. 161, sec. 10–102(2)(a)(iii), at 570.

The statute was, therefore, in force when the 1967 agreement was entered into, but was repealed before the period now in question. Petitioners do not mention the repeal of the statute, but, given the order of events, we can only infer that petitioners are arguing that the statute rendered the agreement void from its inception and that the subsequent repeal of the statute did not infuse life into the agreement. We do not agree with petitioners that the 1967 agreement was void.

The case of *Doss v. Yingling*, 95 Ind. App. 494, 172 N.E. 801 (1930), is instructive. In that case, Yingling and two other individuals formed an Indiana corporation, agreeing that none of them would transfer his shares to an outsider before offering them to the other shareholders at book value. A bylaw of the corporation evidenced this agreement. Doss subsequently became a stockholder of the corporation, acceding to the agreement described above as part of the consideration for the transfer of the stock to him. Yingling later attempted to sell some of his stock to an outsider, and Doss sued to enjoin the sale.

During the period concerned, stock transfers in Indiana were subject to Indiana Code Annotated section 4979 (Burns 1926) (repealed 1963). That section was Indiana's enactment of section 15 of the Uniform Stock Transfer Act, and was substantially identical in relevant respects to the repealed Idaho statute cited by petitioners and set forth above. Yingling demurred to Doss' complaint, on the grounds that the restriction that Doss sought to have enforced was not stated on the certificates that he, Yingling, intended to transfer, as required by statute. The trial court sustained the demurrer, but the appellate court reversed, commenting that (172 N.E. at 803):

In several states the courts of last resort have refused to recognize as valid a by-law of a corporation such as we have before us, but have enforced an

agreement which agreement is evidenced by the by-law, entered into and acted upon by the stockholders, which gives to the other stockholders an option to purchase the stock before sale to an outsider.

\* \* \* \* \* \* \*

The complaint in this instance is not predicated solely upon the validity of the by-law, but also upon an agreement entered into between the incorporators at the time the corporation was organized \* \* \* which agreement was thereafter evidenced by the by-law heretofore set forth, observed through successive years by each incorporator upon the sale of the common stock of the corporation.

So whether we hold the restriction on the alienation on the common stock as valid under the provisions of the by-law or sustain the restrictions by virtue of an agreement entered into between the original incorporators, and evidenced by the by-law, which agreement and by-law were thereafter acted upon and observed by the stockholders of this corporation, the result is the same.

Although the Idaho courts have not spoken on the issue, we think they would reach a similar conclusion.[20]

Whatever effect the failure to include the restriction on the face of the certificates might have as to bona fide third-party purchasers, nothing in the record in the present case indicates that the 1967 agreement would not be upheld as a contract between the parties thereto.[21] We therefore reject petitioners' argument that the agreement was invalid. *Barton Naphtha Co. v. Commissioner, supra* at 118–119. Accord *Krauss v. Kuechler*, 300 Mass. 346, 15 N.E.2d 207 (1938).

Petitioners also cite, without elaboration, Idaho Code secs. 28–8–204 and 30–1–23A. Neither of these sections is relevant to the present cases. Idaho Code section 28–8–204 (1980), provides as follows:

*Effect of issuer's restrictions on transfer.*—Unless noted conspicuously on the security a restriction on transfer imposed by the issuer even though otherwise lawful is ineffective except against a person with actual knowledge of it.

This section is Idaho's enactment of article 8, section 204 of the

---

[20]Compare *Security Life & Accident Ins. Co. v. Carlovitz*, 251 Ala. 508, 38 So. 2d 274 (1949), which we find to be distinguishable on its facts from the present cases.

[21]Petitioners cite *Hulse v. Consolidated Quicksilver Min. Corp.*, 65 Idaho 768, 154 P.2d 149 (1944), but that case did not concern an agreement between shareholders comparable to the 1967 agreement.

Uniform Commercial Code. The Comment to Official Text states at paragraph 4 that:

This section deals only with restrictions imposed by the issuer and restrictions imposed by statute are not affected. * * * Nor does it deal with private agreements between stockholders containing restrictive covenants as to the sale of the security as in *In re Consolidated Factors Corporation*, 46 F.2d 561 (D.C. N.Y. 1931).

The restriction in the present cases was not imposed by the issuer, News, but by an agreement between its stockholders. Therefore, its validity is unaffected by Idaho Code section 28–8–204.

Idaho Code section 30–1–23A (1980), also cited by petitioners without comment, was enacted in 1979 and made effective "on and after July 1, 1979." 1979 Idaho Session Laws ch. 104, sec. 8. The section is, therefore, irrelevant to the present cases, which involve the taxable years 1976 through 1978.[22]

Accordingly, we hold that the Marineaus' stock constituted excluded stock during the years in question, and, consequently, that petitioners constituted a controlled group of corporations during those years.

To reflect the foregoing,

*Decisions will be entered for the respondent.*

---

[22]Even if Idaho Code sec. 30–1–23A (1980) had been in force during the years in question, petitioners do not explain how it would support their argument that the restriction contained in the stockholders' agreement was invalid. The section provides:

"Restriction on transfer of shares.—(a) A written restriction on the transfer or registration of transfer of shares of a corporation, if permitted by this section and noted conspicuously on the certificate representing such shares, may be enforced against the holder of the restricted shares or any successor or transferee of the holder * * * . Unless noted conspicuously on the certificate, a restriction, even though permitted by this section, is ineffective except against a person with actual knowledge of the restriction."

It is uncontested that the Marineaus had the "actual knowledge of the restriction" referred to in the statute. The statute would not, therefore, render the restriction ineffective against them. The statute further provides:

(b) A restriction on the transfer or registration of transfer of shares of a corporation may be imposed * * * by an agreement among any number of shareholders or among such holders and the corporation. * * *

(c) A restriction on the transfer of shares of a corporation is permitted by this section if it:

(1) Obligates the holder of the restricted shares to offer to the corporation or to any other holders of shares of the corporation or to any other person or to any combination of the foregoing, a prior opportunity, to be exercised within a reasonable time, to acquire the restricted shares * * *

These passages would tend to support the validity of the restriction in question rather than refute it.